## UNITED STATES v. WILLIAMS.

### (District Court, W. D. Texas. May 19, 1900.)

### No. 157.

1. CRIMINAL LAW—EVIDENCE—CONFESSION.

Defendant, after his arrest, charged with murder, made a confession to the officer, which was taken down by a stenographer, and afterwards written out in typewriting, and signed by the defendant before a magistrate. When introduced in evidence, such confession contained a number of interlineations made with a pen, all of which were inculpatory, and some, bearing on the degree of the offense, of a character to render it doubtful whether the language was that of defendant. Aside from the confession, there was no evidence as to the circumstances attending the killing, or that it was done by defendant. *Held*, that the admission of the confession for consideration by the jury in its entirety was error, which entitled the defendant to a new trial, in the absence of satisfactory evidence showing when or by whom the interlineations were made.

2. SAME.

A jury is not justified in disbelieving that part of a confession which tends to exculpate the defendant, or reduce the grade of the crime, when there is no other evidence tending to contradict such statements, or conflicting therewith.

3. SAME—INSTRUCTIONS.

Act Jan. 15, 1897, giving the jury in cases of murder the right to qualify their verdict of guilty by adding the words, "without capital punishment," leaves the exercise of such right entirely to the judgment and discretion of the jury, and an instruction which might be construed to require them to find palliating circumstances to authorize such qualification is erroneous.

Prosecution for Murder. The defendant was convicted at Laredo, Tex., April term, 1900. On motion for a new trial.

Henry Terrell and T. W. Dodd, for the United States.
Andrew Winslow and J. O. Nicholson, for defendant.

BOARMAN, District Judge (orally). On the trial of the case the evidence was not taken down. Much to the regret of the court, it was impracticable to secure the services of a stenographer. The court, in considering this motion, will have to rely upon statements of counsel on either side, together with my own memory as to the material facts developed in the testimony. The counsel agreed pretty well as to what the testimony was. According to my recollection, the testimony is much like the statements upon which the counsel agreed. The government offered the written confession of the defendant, which was taken down by a stenographer, soon after the defendant was arrested, at the instance of the deputy marshal who arrested him. It is conceded that the governor of the state of Texas offered a reward of $250 for the arrest of the man that killed Hardesty. The government offered no testimony other than defendant's confession to show, or even suggesting, that defendant killed deceased. There was nothing said by any of the government witnesses in relation to the cause of the killing, or as to the matters or circumstances attending immediately the killing. The government relied alone for conviction upon the confession of defendant, supplemented by other testimony, which related to some material circumstances occurring after the homicide.

It seems, but for defendant's confession, neither the court nor the jury would have had any knowledge of the fact that defendant killed Hardesty, or of any circumstance attending the killing, antecedent thereto or subsequent to the killing. The confession is as follows:

"On Saturday morning, December the 9th, 1899, I was standing in Troy Johnson's saloon, about twelve o'clock. A young fellow by the name of Jack Hardesty came there. He was from Monterey. He was singing and drinking, and he left. I didn't drink any at all with him. It was some song that he sang concerning Kentucky. I went around to the National Depot about one o'clock, to see the train master, and came back to the saloon, and went to the I. & G. N. Depot to see the train come in. and there I met him again. He came up, and spoke to me. and asked me if I was going to town, and I told him 'Yes.' After the train came in. he and I walked to the post office, and I asked for my mail. There was no mail for me, and then he and I left from the post office, and went to the Jarves Plaza, and sat down there for fifteen minutes. There was passing some young white ladies, and they laughed at him and I sitting there. and he made some remarks, and I told him he ought not to do it, because the white people down there, who wouldn't do anything to him, they would punish me. We left the plaza, and went to the I. & G. N. Depot, and stood up there talking, and he told me he was going away next morning on the freight train. I and he were going together. He brought it up about those white ladies again. and asked me what rights did I have to take up for them. I told him I didn't have any rights, any more than it was wrong for him to make expressions that way; and he said again, if I thought I had any rights, I had better take some of the rights out of him. I told him I didn't want to have any fuss with him, because he might have the advantage of me. Then he walked up, and struck me, and called me a ——, and then he said if I didn't like that to just go with him on the prairies, and he would finish it. We went, and got through the government post fence, and walked out in the reservation. and passed where lots of mesquite bushes were near a path, and just as he got behind the bushes he runs out with a big one-edge dirk knife. and he started toward me, and as he rushed upon me I caught the blade with my arm, and took the knife from him, and cut him. as he was coming to me. in the neck. When I cut him he said 'Oh, Lord!' and he turned and run away, and I followed after him, and cut him in the back. kicked

I ~~cut~~ him in the head, and stamped him in the back, and then I threw the knife away, and jumped and run. He was a white man. As we was coming from the post office. he had a quart bottle of mescal in his pocket, and he asked didn't I want some, and I told him 'Yes,' and he drank some, and we went into a dry-goods store. On the street running west of Convrey's livery stable, on the corner on the same block.—a yellow painted house, a drug store on the corner. Both of us went in there to see some combs, and the clerk showed us some combs. and he bought one for fifteen cents, and he pulled out a ten-dollar greenback and two silver dollars, and gave it to me, and told me to keep until the freight train left next morning, as he and I were going off together. After I killed this man, I ran and went to the back of the Commercial Hotel, around to the kitchen. and I knocked on the window, and called Abe Temple, and he came to the window, and asked me if I wanted something to eat, and I told him 'No'; to hurry, and come out, because I was in trouble; and he asked me what was it, and I told him I had cut a man, and he told me to meet him at the plaza. I was going to get me some clothes, and I went to a dry-goods store, and bought me a pair of pants, and a pair of shoes, and a shirt, and then went back to the plaza, and sat there until Abe Temple came. When Abe came. we got a cup of coffee, and got in a hack, and went down to the river bridge, and we had a dispute with the hack driver about the fare, and then I gave him one dollar Mexican money, and we got the hack; and I changed $7.00 with Mr. Navarro, the bridge keeper, and then we crossed, and went to some —— houses; and the first crowd of —— in there they made light of us, and called us negrones, and we left there and went down the streets, and met a policeman, and Abe asked the police-

man if he would take care of me that night, and feared I might get robbed. As the policeman was carrying me to the police station, and as Abe departed, I told him 'No'; to take me to the depot, so I could get that train going out that night. So the policeman took me to the depot, but the train had done gone. And then I went back in town, and struck up with another ——, and I gave her one dollar Mexican money to stay with her all night; and then the next morning I went back to the depot, and got on the passenger train, and went to Monterey, and stayed in Monterey four hours, and got on the passenger train at Monterey, when a friend of mine that was portering on the road put me in a small room, and brought me to Eagle Pass. The porter's name was Will Kimble. After I got to Eagle Pass, I went up the post, and got dinner, and have been up in the post ever since until arrested. I was walking out Saturday morning, and went across the river, and a man asked did I want a job of work, and I told him 'Yes,' and he told me that I could come back. I asked him what time it was, and he said it was half past one, Mexican time, and I told him I had to be back at half past two; and I came back, and he gave me a paper, and it was on the paper these words: 'Put these two men to work at once, and to-morrow, if possible.' I went on across the railroad bridge, and went to the freight house, and asked for Mr. Vaughn. Mr. Vaughn wasn't in, and Mr. Dowe, the sheriff, asked me my name, and I told him 'Arthur Williams,' and he said, 'I have a warrant for you,' and I told him, 'All right,' and he brought me to the jail house, and put me in jail. I was arrested Saturday, January 6th, and put in jail the same day, Saturday 6, 1900. From 5 o'clock in the evening until 7 o'clock the evening of the murder, he and I drank a quart of mescal. He was very drunk, but I was not drunk."

The confession, taken as a whole, is sufficient, under the law, to inculpate defendant in the crime of manslaughter. The exculpatory statements therein, if true, forbid the conclusion that he is guilty of murder. On inspection of the typewritten statements which show the confessions of the defendant, it will be seen that pen and ink interlineations and additions appear therein at several places. There is nothing stated by the official before whom the confession was taken, and there is nothing in the paper itself, to show when, or at what time, or by whom such interlineations were made, or who made them. The words and sentences written in capital letters herein will call attention to the interlineations. It appears from the testimony that Deputy Marshal Hanson arrested defendant; and a shorthand writer, at his instance, took down the statements of defendant. These statements were afterwards transcribed into typewritten longhand, and in the typewritten matter appear the interlineations made with pen. After the statement of defendant was transcribed into typewritten longhand, it appears that defendant was taken before a justice of the peace, and that before such justice he stated under oath that the statements were true and correct, and that he made such statements of his own free will and accord, after being warned by Deputy Hanson "that the statements would be used against him, and not in his own favor." It is contended by counsel for defendant that the confession offered by the government should not be received, "because the admissions were made at a time and under circumstances when defendant's mind was oppressed by the calamity of the situation, and were made, if made at all, with the hope of reward, if not with the fear of punishment, for this: that the said defendant was then and there told by the said deputy marshal, at and before the time of making such alleged confession, that he (the said deputy) had dead proof against him (the said

defendant) showing that he (the said defendant) was the man that killed Jack Hardesty, and that it might be better for him (the said defendant) to make a voluntary statement in relation thereto, as he (the said defendant) might say something therein showing justification, or at least extenuating circumstances." It is agreed that the deputy marshal made such a statement, substantially, to the defendant. I think the confession was properly admitted, and given to the jury for what it is worth, because, though the circumstances and surroundings under which it was made by the defendant may have had a tendency to impose on or surround him with illegal conditions, yet it appears that the defendant, of his own free will and accord, acknowledged before a competent officer the truthfulness of such statement, made by him antecedently before the deputy marshal. The objection urged by counsel as to the interlineations, not being disposed of in this suggestion, will be further considered. If the interlineations and additions complained of were in the paper when it was read to defendant, if it was read at all to him, of course he is bound by them as he is bound by any other part of the confession. The justice of the peace whose jurat made the paper authentic was a witness on the trial. He said he knew nothing, of his own knowledge, about the interlineations; that, so far as he knew, they were on the paper when sworn to by the defendant. He himself did not make the interlineations, and could give no clear evidence one way or the other as to them. There was no evidence showing who made the interlineations, but one witness said he thought the stenographer who took the statement made them. The stenographer himself was not a witness in the case, and there was no witness who could give any satisfactory evidence as to who made the interlineations, or at what time they were made. It will be seen that the interlineations in, and additions to, the typewritten matter are all inculpatory, and that they are very damaging in their purport to the defendant in showing that he was actuated by malicious purpose in his acts and in the incidents occurring at the moment of the killing. There was no one present but himself and deceased at the time of the killing, and there are but few circumstances, if any, occurring at the time which would illustrate any material matters relating to the killing. At the place, or near to it, where Hardesty was found dead, the knife of deceased was found, and the ground showed evidence that a scuffle had taken place between the parties. There was nothing about the body of deceased to show that he had been robbed. The inculpatory words in the interlineations show a malicious purpose to kill, and they might (if other circumstances and facts in the evidence should warrant such a conclusion) show such express or implied malice as is an essential ingredient in the crime of murder. The sentence in the typewritten statement in which the first interlineation is made showing inculpatory confession made by the defendant reads, with interlineations left out, as follows: "When I cut him, he said, 'Oh, Lord!' and he turned, and run away, and I cut him in the back." With the interlineated words it reads as follows: "When I cut him, he said, 'Oh, Lord!' and he turned to run away, and I FOLLOWED AFTER HIM, AND cut him in the back." The second inculpatory interlineation is found in the sentence following

the one just quoted. With the interlineation it reads as follows: "I kicked him in the head, and stamped him in the back." The word "cut" is erased, and the word "kicked" interlined. At the end of the typewritten transcription made by the stenographer, a sentence, complete in itself, in pen and ink, is added, as follows: "FROM FIVE O'CLOCK IN THE EVENING UNTIL SEVEN O'CLOCK IN THE EVENING OF THE MURDER HE AND I DRANK A QUART OF MESCAL. HE WAS VERY DRUNK, BUT I WAS NOT." It will be seen, without further comment on the interlineations, how damaging they were to defendant in disclosing the malicious animus which must have, if the interlineated words be correctly written, attended, immediately, the homicide. The last sentence, which closes defendant's statement, is written with pen and ink. The sentence makes two lines, and the lines are close together, and the words are written close together. Surely, these lines show an after-thought either of defendant or of the author of the lines. The sentence itself does not relate to anything said by the defendant in the context of the latter part of the admissions. It shows the use of the word "murder" by the defendant, and suggests that he is making against himself a confession of murder. Nothing else in the confession conveys the suggestion that the defendant used words purporting to admit that he committed any acts which in themselves would make out a case of murder against him. The sentence written in pen and ink further shows that the defendant confesses that he killed a man who was very drunk, while he himself was not drunk. Without discussing just now by whose hands the interlineations were made, or at whose instance or at what time they were made, I think it is very questionable whether or not the defendant voluntarily used the word "murder" in making his confession. The suspicion imposed on the paper by the interlineation was not cleared up by "satisfactory" evidence. It appears by the confession that the defendant met the deceased about 12 o'clock of the day of the killing, in a barroom, and that he (the deceased) was drinking and singing. If the last sentence referred to states the truth, the killing itself must have occurred after 7 o'clock at night on December 9th. The time between 12 o'clock, when the defendant met the deceased, and 7 o'clock p. m., when they had finished drinking a quart of mescal, is not definitely accounted for in the confession, or by any other evidence. The defendant, having met Hardesty at 12 m. in the barroom, left him there. Later on, defendant went to the National Depot, and from there to the International & Great Northern Depot to see the International & Great Northern train come in, and there met Hardesty again. After the International & Great Northern train came in, defendant and deceased went to the Jarves Plaza, and sat down a few minutes. He says: "We left the plaza, and went to the I. & G. N. Depot, and stood up there talking, and he told me that he was going away next morning at 4 o'clock on the freight train." He says while they were talking (he and deceased) deceased "brought up the matter about the white ladies, and asked me what right I had to take up for them. I told him I had no other rights than that it was wrong for him to make expressions that way, and he said again that if I thought I had any rights I had better take some

of the rights out of him." "Then he walked up, and struck me, and called me" vulgar names, "and then he said if I did not like that to just come with him on the prairies, and he would finish it." The defendant and deceased left the depot, and went near by, through the government fence to the grounds of the reservation, and the killing occurred on the reservation, presumably shortly afterwards. So far as the confession shows how the time was spent after 12 o'clock m. until the killing, the sentence added in pen and ink to the confession to the effect that defendant and deceased drank a quart of whisky between 5 and 7 seems not to be true. On the trial of the case I was not so much impressed with the importance of the matter as to the time shown in the last sentence as I was in my purpose and endeavor to learn how, and when, and at whose instance the interlineations were made, and if they were made before or after they were shown to or read to the defendant. But on further consideration of the pen and ink sentence—the sentence in which the defendant seems to have confessed that the killing was murder—I find it more difficult to determine, from the oral evidence, at what time or by whom the interlineations were made. My attention during the trial was not called to the time, stated in the pen and ink addition, in which the deceased and defendant drank a quart of mescal. If the statement made in the last sentence, or the purport of it, was in the language of the defendant himself, it certainly was inculpatory, and very damaging, before the jury to the defendant. On the trial, evidence was given to the jury by the government with a view of showing at what time, and by whom, and at whose instance the interlineations were made in the typewritten statement. My recollection is that the evidence thereon left these pertinent matters in grave doubt. On the trial I directed that the whole confession, as now appears, should go to the jury. I am not now satisfied that my conclusions then were free from error. None of the witnesses offered by the government seemed to have any knowledge as to the interlineations which would have enabled them to give positive testimony on that important matter. It is probable the stenographer is the only man who could have given satisfactory testimony as to the interlineations.

Considering the want of connection between the context of the latter part of the confession and the sentence which was added with pen and ink, and the purport of such sentence, it seems very probable, in the absence of a better character of evidence, that the words in the last pen and ink sentence, which purport that the defendant called the killing of deceased "murder," and which suggested the killing itself could not have occurred before 7 o'clock, were either unwarrantably interlined by some one, or that the language of the defendant was not correctly taken down. Putting aside for the moment the criticism I have just made as to the purport of the words in the pen and ink sentence in the interlineations, it appears that, if the words themselves be true, the killing could not have occurred until after 7 o'clock at night,—about one hour and a half after dark. One witness for the government said he saw the defendant talking to Jack Hardesty, deceased, about 4 p. m., at the International & Great Northern Depot; that he had also seen them together during the day, before that time.

Another witness for the government saw Hardesty at the depot about 4 o'clock,—about the time the International & Great Northern train usually comes in,—but did not see defendant with him. The killing occurred presumably a few minutes after defendant and deceased left the depot and went on the reservation grounds. If they remained together at the depot, drinking, from 4 o'clock until they went through the government fence by the depot, it seems that some persons about the depot would have seen them together.

The defendant's counsel urges another reason for a new trial. He says the court was in error in charging the jury as follows:

"That it was in their province to consider the whole of this confession, and believe such parts thereof as they might think true, and disbelieve such parts as they might believe untrue, or inconsistent with the other facts in evidence before them."

Counsel contends this was error on the part of the court, because there was no evidence, direct or circumstantial, before the jury, upon the trial of this cause, that inculpated the defendant as the guilty man, other than the evidence found in his said confession, introduced by the prosecution, and that, therefore, such instructions, unsupported by any evidence, were illegal. The charge given by the court was, substantially, as stated in the counsel's objection. In giving the charge, substantially stated, however, the court added that they (the jury) must take the confession as an entirety, and they could believe such parts thereof as they might think true, and disbelieve other parts; but, if they disbelieved any part of the confession, their disbelief thereon should be grounded on their opinion that the testimony showing the facts and circumstances of the whole case satisfied them that the discredited part is not true. The court conveyed to the jury the thought that they might believe some part of the confession and disbelieve other parts, and that, if they disbelieved some part of it, such disbelief as to that part should come into their minds because of some evidence, circumstantial or direct, which in itself led them to believe the discredited part of the confession was not true. I think that the counsel's objection to the charge on that matter was not so much as to what the court said as it was that there was no evidence, either circumstantial or direct, before the jury, which contradicted or put in question the truth of any statement made upon material issues in the defendant's confession. Taking this view of the merits of the objection, I think his objection is well founded, because, in my recollection of the evidence, there was no evidence, direct or circumstantial, introduced by either side, that contradicted or conflicted with the statements made by the defendant as to any material facts relating to the essential matters directly in judgment. The jury had no evidence before them as to the killing, or as to the animus or purpose of the defendant in killing Hardesty, except such evidence as is contained in the language, or is fairly deducible therefrom, of the defendant's confession, which contradicted the truthfulness of the statements made by the defendant on the material issues. It appears, without contradiction, that the defendant and the deceased, before they left the International & Great Northern Depot to go through the government fence to the reservation, had some ugly talk or quarrel,

and that they both went willingly together to the reservation, out of sight of everybody, either in the daytime or at nighttime, for the purpose of finishing their quarrel. It appears, too, that the deceased was the only one of the two persons who had a weapon of any kind or arms in his possession. The knife with which deceased was killed belonged to Hardesty, and presumably was on his person when they went to the reservation. Among other things, in charging the jury, I stated that the confession of defendant, if true, and taken as a whole, showed that he was guilty of manslaughter; that is, if they took his confession as true, he was guilty of manslaughter. But if they found in the evidence either direct or circumstantial proof of facts which forbid them to believe the exculpatory statements made by defendant, and they further believed from such established facts or circumstances —so contradicting the exculpatory statements—that when the defendant and the deceased left the International & Great Northern Depot he intended to take his (Hardesty's) life, defendant may be guilty of the crime of murder; that is, if they discredited, or could not, under all the evidence, believe, the parts of the confession which were exculpatory of defendant, it became their duty then, as far as was practicable, to ascertain and determine for themselves at what moment, or at what time, the actuating intention to kill Hardesty came or entered into the mind of defendant; that no conclusion by them as to whether defendant was guilty of manslaughter or of the crime of murder could be reached satisfactorily to the ends of justice until they were, in their deliberation on the circumstances and facts of the whole case, able to fix the time, and say beyond a reasonable doubt what time the actuating intention or purpose to kill Hardesty put in motion the acts of defendant, which resulted in Hardesty's death. Along this line the court stated to the jury: "If you conclude, beyond a reasonable doubt, from all the evidence illustrative of the purpose of defendant in killing Hardesty, that the actuating purpose or intent to kill him was in defendant's mind at the time he started with the deceased, or that deliberate purpose to kill came into his mind before the assault began which ended in Hardesty's death, the defendant would be guilty of murder;" that is, "If, in your conscientious effort to fix the time in question, you should find, as a resultant of all the evidence, proof, free from reasonable doubt, which forbids you to believe defendant's exculpatory statement in relation to the quarrel which he said he had with the deceased at the railway depot, and as to what occurred after they had gone on the reservation grounds, then you may be authorized to find that defendant killed Hardesty with malice expressed or implied. If, on considering the whole case, you find any facts or circumstances shown in the evidence before you to disprove the exculpatory statement made by defendant as to the quarrel he said he had with the deceased at the depot, then the state of case would or may show manslaughter, and not murder." The court, in commenting on the evidence illustrating the important issues, drew the attention of the jury to the circumstance that the defendant was without arms, and the only weapon about which we know anything was the dirk knife with which deceased was killed, and which was, presumably, on the person of deceased when they went towards

103 F.—60

the reservation. I stated then to the jury, as I think now, "that the circumstance or fact that the white man was armed and the negro defendant was not would be valuable to the jury in illustrating the animus of either party, or to show the purpose for which, at the time, they presumably willingly left the depot to finish their quarrel." It seemed to me then, as it does now, a strong circumstance to show that the purpose on the part of the defendant to kill the deceased may have entered into his mind after they got upon the grounds of the reservation. And further, I thought then, as I think now, it was a circumstance in itself, in the absence of any direct proof as to the acts of either party immediately before or after the assault began, to show that the motive to kill came into the mind of the defendant in hot blood that may have been engendered in or from some acts occurring after they had begun their movements to the reservation grounds. Or, at any rate, the circumstance just mentioned, I think, should have suggested a reasonable doubt upon the question of whether or not all the facts or circumstances disclosed in the evidence showed a case of manslaughter or of murder. If, in such a state of case, a reasonable doubt should have come into the mind of the jury, then the verdict against the defendant should have been for manslaughter, rather than for murder.

A further objection urged by counsel for defendant is that the court was in error in instructing the jury as follows:

"The law, in its humane provisions, gives you the right, in the event you find the defendant guilty, to say in your verdict, 'Guilty without capital punishment.' Then the sentence under the law would be that the defendant be confined to the penitentiary for life. Such merciful provision in your verdict, to say the least of it, would be indicative of some palliative fact or circumstance or doubt which you might entertain in relation to the degree of guilt of the defendant in committing the homicide."

The defendant's counsel urges, in discussing the court's alleged error, that the defendant was entitled to an instruction to the jury to the effect that they were authorized and fully empowered, in the event they found the defendant guilty, to say in their verdict, "without capital punishment," regardless of the existence or nonexistence of any palliative facts, circumstances, or doubts in the case. It may have been that the language used by the court in its charge, though it was not just such language as stated in the objection of counsel, was misleading, and damaging to the interest of defendant, because it did not fully state that the jury might find a verdict "without capital punishment," even though there were no mitigating or palliative circumstances shown in his favor by the evidence. It seems that the right to qualify a verdict of guilty by adding the words "without capital punishment" is conferred by the law—by the act of January 15, 1897—upon the jury in all cases of murder:

"That the act does not itself prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exercise of this right, but commits the whole matter of its exercise to the judgment and the consciences of the jury. The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court or the jury is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment."

Under the view announced by the supreme court in the case of Winston v. U. S., 172 U. S. 313, 19 Sup. Ct. 212, 43 L. Ed. 460, the language of which I have just quoted, it seems that the objection urged by defendant's counsel is well founded, because the language used in the charge by the court may have had the effect of limiting the power vested in the jury in the trial of such cases. New trial granted.