## Court of Appeals.

### *March*, 1890.

### PEOPLE *ex rel.* KEMMLER *v.* DURSTON.

(Affirming 7 *N. Y. Crim. Rep.* 364.)

CONSTITUTIONAL LAW.—DEATH PENALTY.—EXECUTION BY ELECTRICITY.—CRUEL AND UNUSUAL PUNISHMENT.— LAWS 1888, CHAP. 489.

Where upon the return to a writ of *habeas corpus* it appears that the relator is in custody under a judgment of a court of competent jurisdiction, it is the duty of the court to dismiss the writ, and remand the relator into custody unless it can be shown that the trial court was without jurisdiction to pass the sentence which it did.

The provision of the State Constitution, article 1, section 15, forbidding the infliction of cruel and unsual punishments, confers upon the courts the right to declare null and void legislative action prescribing such punishment.

If it cannot be made to appear that a law is in conflict with the Constitution by argument deduced from the law itself or from matters of which a court can take judicial notice, then the act must stand.

Every act of the legislature must be presumed to be in harmony with the fundamental law until proved to be contrary thereto.

The testimony of experts is not admissible in the interpretation of a legislative act to show that some clause of the Constitution is

violated.    If the act, on its face, is not in conflict with the Con-
stitution, then extraneous proof cannot be brought in to show
that it is in conflict therewith.

Appeal by the relator, William Kemmler, from an order
of the General Term of the Supreme Court, in the 5th
Department, affirming an order made by the county judge
of Cayuga County, dismissing a writ of *habeas corpus* sued
out by the relator, and remanding him to the custody of the
defendant.

The opinions of the county judge and of the General
Term are respectively reported, *ante*, 350 and 364.    The
facts sufficiently appear in these reports.

*William Bourke Cockran,* for relator.
That this is an unusual penalty is conceded on all sides,
but what current of electricity will cause death is unknown.
No expert, however learned or skillful, is able to state posi-
tively that any electrical current will cause immediate death,
but all are agreed that unless death be instantaneous, the
agony which would be inflicted by it would be intense
beyond description.    Some say that its effect would be to
carbonize the victim, others that it would result in mummi-
fication, still others that it would cause a straining of the
nerves in different parts of the body with such violence as
to inflict agony more intense than any that could be caused
by the rack.    The facts testified to before the referee estab-
lish two propositions beyond dispute : First, that unless
death be immediate, the torture will be exquisite ; and,
Second, that no means have been yet discovered by which
immediate death can be certainly produced.    It follows,
therefore, that a person subjected to this penalty will be
exposed to punishment which is certainly unusual, and
which may be cruel, and the relator's constitutional immu-
nity protects him from even the risk of torture.    The con-
stitutional inhibition renders any law passed by the Legisla-
ture in violation of its provisions unconstitutional and void.
Article 1 of the Constitution grants to every citizen of this

State certain privileges and immunities of which he can neither divest himself, or be deprived by any power whatsoever. The Legislature may decree that death shall be the punishment of any particular crime, but it cannot prescribe a cruel or unusual method of punishment. It may take human life, but cannot experiment with it. This particular section is copied from the English Bill of Rights, but no analogy can be drawn between the powers of Parliament and those of our Legislature. The one is omnipotent; the powers of the other are restrained within well defined limits. The doctrine of constitutional limitations is peculiar to this country. A provision identical in language is to be found in the eighth Amendment to the Constitution of the United States, and the Supreme Court has expressly held that it has a binding force and effect, and that the power of Congress to punish criminals is subject to the limitations that the penalty to be inflicted must not be a cruel or unusual punishment. Wilkeson *v.* Utah, 9 *Otto*, 130. A proper interpretation of the constitutional provision would exclude any punishments which are purely experimental, and which are not known to the judiciary to be simple and effective means of extinguishing life without the infliction of needless anguish. It is not intended that the constitutionality of this law depends upon any question of fact. Its validity, however, does depend upon the construction and interpretation of certain words which to the ordinary human intelligence are incomprehensible. It is a question of science, and therefore a question of law. The court cannot decide this question upon any judgment of any scientist or expert or philosopher. It must decide it upon its own knowledge, and upon its own conscience. Public policy and security of our constitutional system alike demand the enforcement of this provision of the State Constitution by the courts. It being conceded that the infliction of the penalty would expose the relator to the risk of torture, the sentence is in violation of the Constitution, and therefore void. A law which exposes the Constitution to the risk of

invasion is as void as though it provided in direct terms for a violation of constitutional provisions. People *v.* Hartung, 22 *N. Y.* 106; Stewart *v.* Palmer, 74 *Id.* 188. The act is unconstitutional, because upon its face it provides for the infliction of an unusual penalty. The constitutional provision, prohibiting the infliction of a cruel and unusual punishment, prohibits and forbids the infliction of any punishment that was not known to the common law. The Bill of Rights was the formal enactment by Parliament of the Declaration of Rights adopted by the Convention which offered the English crown to the Prince of Orange in 1689, and the Declaration of Rights was, in no sense, an enactment, but was a declaration of the ancient English common law, similar in its character to the Great Charter of King John, and the Petition of Rights presented by Parliament to King Charles I. in 1628, and which was drawn by Sir Edward Coke. The General Term fell into the error of supposing that the prohibition of the Bill of Right was against cruel and illegal punishments, but it is manifest that a prohibition of an illegal punishment would be absurd. The illegality of a punishment is in itself a prohibition of it. To prohibit an unusual punishment, however, is more intelligible. It is to restrict the manner in which the power over life and limb may be exercised, and as the relator claims it is to restrict it so as to forbid the infliction of any cruel punishment except in the manner which was known to the common law. It is a historical fact that in 1688 almost every crime known to the law had been regulated by statute, and that there were, at that time, few if any crimes punishable by the common law. The Declaration of Rights, therefore, in providing that any unusual punishments ought not to be inflicted must have meant something more than a mere prohibition against the infliction of punishments which were contrary to the law. It was a declaration that, according to the ancient laws and customs of England, no subject should be exposed to the infliction of any cruel punishment that was unknown to the common law, and in declaring that this was a feature of

the original compact between the king and people, it meant to make that immunity inviolable forever. The salient features of the first article of our Constitution, in almost identical language, can be found in the Magna Charta, in the Petition of Right, and in the Declaration of Right. These great instruments have been held always sacred in England since the Revolution, both by king and Parliament. They were, however, declarations of principles that had been asserted from the earliest time. They were adopted into our Constitution that they might, in the full significance which they have borne for ages, be sacred forever to citizens of this State, and the particular provision now under discussion must therefore be construed to mean precisely what it meant when it was presented by the Convention to the Prince of Orange as one of the constitutional rights of the subject. If it be given that meaning by this court, it must be held to exclude any fanciful or fantastic experiments with human life and the infliction of any cruel penalty unknown to the common law.

*Charles F. Tabor,* Attorney-General, for respondent.

O'BRIEN, J.—The relator, being in the custody of the respondent, the agent and warden of the State Prison at Auburn, applied for a writ of *habeas corpus* to inquire into the cause of detention, which was made returnable by the officer granting it, before the County Judge of Cayuga County. The relator in his petition for the writ stated that the cause or the pretense of the imprisonment complained of was that, after his indictment and trial for the crime of murder in the first degree, and his conviction thereof in the Court of Oyer and Terminer, he was sentenced by that court to undergo a cruel and unusual punishment for that crime, contrary to the Constitution of the State and of the United States, and was threatened with the deprivation of life without due process of law by reason of such illegal sentence and judgment of the court. The writ was duly

served upon the respondent, who made return thereto that he detained the relator in his custody as agent and warden of the prison by virtue of the judgment of the Court of Oyer and Terminer, held in the County of Erie, whereby the relator was duly convicted of the crime of murder in the first degree, and also by virtue of a warrant duly delivered to him under the hand and seal of a Justice of the Supreme Court presiding at the said Court of Oyer and Terminer where the relator was convicted, which recited the indictment, trial, conviction, and sentence of the relator and directed the respondent to carry the same into effect in these words : " Now, therefore, you are hereby ordered, commanded and required to execute said sentence upon him, the said William Kemmler, otherwise called John Hort, upon some day within the week commencing on Monday, the 24th day of June in the year of our Lord, one thousand eight hundred and eighty-nine and within the walls of Auburn State Prison, or within the yard or adjoining thereto, by then and there causing to pass through the body of him, the said William Kemmler, otherwise called John Hort, a current of electricity of sufficient intensity to cause death, and that the application of such current of electricity be continued until he, the said William Kemmler, otherwise called John Hort, be dead."    This command and direction to the warden were in accordance with the sentence actually passed upon the relator after conviction, in these words : " The sentence of the court is, that within the week commencing on Monday, the 24th day of June, in the year of our Lord one thousand eight hundred and eighty-nine, and within the walls of Auburn State Prison, or within the yard or enclosure adjoining thereto, the defendant suffer the punishment of death, to be inflicted by the application of electricity, as provided by the Code of Criminal Procedure of the State of New York, and that in the meantime the defendant be removed to and until the infliction of such punishment be kept in solitary confinement in said Auburn State Prison."

On the return day of the writ, the relator and the respondent appeared by counsel before the County Judge, and by agreement of counsel the production of the relator pursuant to the command of the writ was waived. Counsel for the relator then offered to prove that the infliction of the penalty named in the sentence,—namely, death by the application of electricity,—is a cruel and unusual punishment within the meaning of the Constitution, and cannot therefore be lawfully inflicted. The Attorney-General objected on the ground that the court had no authority to take proof in regard to the constitutionality of the statute. This objection was overruled by the County Judge, and the counsel for the respective parties agreed that a referee be appointed for the purpose of taking the testimony in pursuance of the offer. In this way a mass of testimony was given upon both sides, certified by the referee to the County Judge, and embraced in the extended record before us. The result was that after a hearing upon the report of the referee, the County Judge dismissed the writ and remanded the relator to the custody of the respondent.

When it appeared from the return of the respondent that he detained the relator in custody under and by virtue of the judgment of a court of competent jurisdiction, wherein the relator was convicted of murder, it was the duty of the County Judge to dismiss the writ and remand the relator to the custody of the agent and warden of the prison, unless it could be shown that the Court of Oyer and Terminer was without the jurisdiction to pass the sentence which it did. People *ex rel.* Frey *v.* The Warden, etc., 100 *N. Y.* 20; 3 *N. Y. Crim. Rep.* 543; People *ex rel.* Tweed *v.* Liscomb, 60 *N. Y.* 559. It is not denied that the court had such jurisdiction, providing that the Legislature had power under the Constitution to enact chapter 489 of the Laws of 1888, entitled "An act to amend sections 491, 492, 503, 504, 505, 506, 507, 508, 509 of the Code of Criminal Procedure in relation to the infliction of the death penalty and to provide means for the infliction of

such penalty." Prior to the passage of this statute, the
punishment by death in every case was to be inflicted by
hanging of the convict by the neck until he was dead. This
provision of law was changed by the amendments of the
Code above referred to, and now the section reads as fol-
lows : " The punishment of death must, in every case, be
inflicted by causing to pass through the body of the convict
a current of electricity of sufficient intensity to cause death,
and the application of such current must be continued until
such convict is dead."

The only question involved in this appeal is whether
this enactment is in conflict with the provision of the State
Constitution which forbids the infliction of cruel and un-
usual punishment.    Const. art. 1, § 5.    This provision
was borrowed from the English statute passed in the first
year of the reign of William· and Mary, being chapter 2
of the statutes of that year, entitled, " An act declaring the
rights and liberties of the subject, and settling the success-
sion of the crown," usually known as the Bill of Rights.
It enacts, among other things, that " excessive bail ought
not to be required, nor excessive fines imposed, nor cruel
and unusual punishment inflicted."    When this statute was.
made part of the Constitution of the United States, the.
word " shall " was substituted for the word "ought," and
in this form it first appears in the Constitution of this State.
adopted in 1846.    It is not very clear whether the provision
as it stands in our Constitution was intended as an admoni-
tion to the Legislature and the judiciary, or as a restraint
upon legislation, inflicting punishment for criminal offenses.
When the statute referred to was enacted in England, it
was not intended as a check upon the power of Parliament
to prescribe such punishment for crime as it considered
proper.    Its enactment did not change any law then exist-
ing, nor did it mitigate the harshness of criminal punish-
ments in that country for more than half a century after it
appeared on the statute book.    A long catalogue of offenses
were punishable by death, many of which were not visited

with that extreme penalty before the Bill of Rights was passed. *Sharsw. Blacks. Comm.* chap. 33, p. 440.

The history of the times in which this provision assumed the form of a law shows that it was, after all, intended to be little more than a declaration of the rights of the subject. The English people were about to place on the throne made vacant by the revolution, a foreign prince, whose life had been spent in military pursuits rather than in the study of constitutional principles and the limitations of power as then understood in the country he was to govern. This was considered a favorable opportunity to enact in the solemn form of a statute, a declaration of the principles upon which the people desired the country to be conducted. But whatever the purpose of this statute was in the country where it originated, we think that its presence in the Constitution of this State confers power upon the courts to declare void legislative acts prescribing punishment for crime, in fact cruel and unusual. This is the power that is invoked against the amendments to the Code of Criminal Procedure referred to by the learned counsel for the relator in an argument addressed to us, interesting on account of its great political and scientific research. We entertain no doubt in regard to the power of the Legislature to change the manner of inflicting the penalty of death. The general power of the Legislature over crimes, and its power to define and punish the crime of murder, is not and cannot be disputed. The amendments prescribed no new punishment for this offense. The punishment now, as before, is death. The only change made is in the mode of carrying out the sentence. The infliction of the death penalty in any manner must necessarily be accompanied with, what might be considered in this age, some degree of cruelty, and it is resorted to only because it is considered necessary for the protection of society. The act on its face does not provide for any other or additional punishment. In behalf of the relator, this legislation is assailed in no other way than by attempting to show that the new mode of carrying out a

o

death sentence subjects the person convicted to the possible risk of torture and unnecessary pain. This argument would apply with equal force to any untried method of execution, and when carried to its logical results would prohibit the enforcement of the death penalty at all. Every act of the Legislature must be presumed to be in harmony with the fundamental law until the contrary is clearly made to appear. Metropolitan Board of Excise *v.* Blaine, 34 *N. Y.* 666, 668; People *v.* Briggs, 50 *Id.* 553, 558; People *v.* Home Ins. Co., 92 *Id.* 328, 344; People *v.* Albertson, 55 *Id.* 50, 54; People *v.* Gilson, 109 *Id.* 389, 397; People *v.* King, 110 *Id.* 418. If it cannot be made to appear that a law is in conflict with the Constitution, by argument deduced from the law itself or from matters of which a court can take judicial notice, then the act must stand. The testimony of expert or other witnesses is not admissible to show that in carrying out a law enacted by the Legislature some provision of the Constitution may possibly be violated. People *v.* Albertson, *supra;* People *v.* Draper, 15 *N. Y.* 532; Matter of the Elevated R. R. Co., 70 *Id.* 327.

If the act upon its face is not in conflict with the Constitution, then extraneous proof cannot be used to condemn it. The history and origin of the enactment we are now considering may very properly be referred to test its validity, and ascertain its true intent and proper interpretation. It has been said that courts will place themselves in the situation of the Legislature, and by ascertaining the necessity and probable objects of the passage of a law, give effect to it, if possible, according to the intention of the law-makers, when that can be done without violating any constitutional provision. People *v.* Supervisors, 43 *N. Y.* 130. Chapter 352 of the Laws of 1886, entitled "An act to authorize the appointment of a commission to investigate and report to the Legislature the most humane and approved method of carrying into effect the sentence of death in capital cases," provided for the appointment of a commission consisting of three eminent citizens who were named therein, and re-

quired them to investigate and report to the Legislature on
or before the fourth Tuesday of January, 1887, the most
humane and practical method known to modern science of
carrying into effect the sentence of death in capital cases.
To enable this commission to make its investigation most
thorough, the Legislature extended the time for it to report
for a year longer by chapter 7 of the Laws of 1887. This
commission early on the legislative session of 1888 made its
report accompanied with a proposed bill which the Legisla-
ture afterwards, and during the same session, enacted, and
this is the statute which is now attacked in behalf of the re-
lator as an unauthorized expression of the legislative will.
The Legislature proceeded to change the mode of executing
the sentence of death with care and caution, and unusual
deliberation. It would be a strange result indeed if it
could now be held that its efforts to devise a more humane
method of carrying out the sentence of death in capital
cases have culminated in the enactment of a law in conflict
with the provisions of the Constitution prohibiting cruel
and unusual punishments. Whether the use of electricity
as an agency for producing death constituted a more humane
method of executing the judgment of the court in capital
cases, was a question for the determination of the Legisla-
ture. It was a question peculiarly within its province, and
the means at its command for ascertaining whether such a
mode of producing death involved cruelty, within the mean-
ing of the constitutional prohibition, were certainly as
satisfactory and reliable as any that are consistent with the
limited functions of an appellate court. The determination
of the Legislature of this question is conclusive upon this
court. The amendment to the Code of Criminal Procedure,
changing the mode of inflicting the death penalty, does not
upon its face, nor in its general purpose and intent, violate
any provision of the Constitution. The testimony taken by
the referee, while not available to impeach the validity of
the legislation, may, we think, be regarded as a valuable
collection of facts and opinions touching the use of electri-

city as a means of producing death, and for that reason as a part of the argument of the relator; but nothing more. We have examined this testimony, and can find but little in it to warrant the belief that this new mode of execution is. cruel within the meaning of the Constitution, though it is. certainly unusual. On the contrary, we agree with the court below, that it removes every reasonable doubt that the application of electricity to the vital parts of the human body, under such conditions and in the manner contemplated by the statute, must result in instantaneous and consequently in painless death.

The order appealed from should be affirmed.

All concur.