# CASES AT LAW

DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW JERSEY.

NOVEMBER TERM, 1907.

---

THE STATE, DEFENDANT IN ERROR, v. MICHAEL TO-
MASSI, PLAINTIFF IN ERROR.

Argued December 11, 1907—Decided January 9, 1908.

1. The record of conviction sets forth that the defendant was tried
by a jury "impaneled and ·returned agreeably to the statute in
such case made and provided." There being no bill of exceptions
tending to negative the correctness of this recital, nor anything
to show a challenge of the array—*Held*, there can be no reversal
on the ground that the jury was not properly impaneled.
2. Under section 136 of the Criminal Procedure act (*Pamph. L.*
1898, *p.* 915), which permits a review of error committed "in the
denial of any matter by the court which was a matter of discre-
tion," there can be no reversal for a matter that lies in discretion,
unless the case shows some application to the trial court in the
premises, for where there is no request there is no denial.
3. Under section 82 of the Criminal Procedure act (*Pamph. L.*
1898, *p.* 897), which provides for a list of forty-eight jurors to be
served upon the defendant in a capital case, and prescribes that it
shall be drawn from the general panel of jurors that may have
been drawn and summoned to attend as jurors at the term at
which the defendant is to be tried, the formality of drawing the
list of forty-eight names to be served upon the defendant is re-
quired only when the general panel consists of more than that

number, the drawing being intended for the purpose of selecting forty-eight names out of a greater number.

4. In a review under section 136 of the Criminal Procedure act (*Pamph. L.* 1898, *p.* 915) there can be no reversal for the admission of a dying declaration, based upon the ground that it was not made under a sense of impending death, where there was evidence justifying the finding of the trial court that the declaration was made under a sense of impending death, for in that case the defendant cannot be said to have suffered any wrong in the premises.

5. A dying declaration may be discredited by showing the bad reputation of the declarant for truth and veracity, but not by showing that the general character of the declarant was bad.

6. The law of this state does not require, in the case of a conviction for murder in the first degree, that the judgment shall set forth the time, place or manner of inflicting the death penalty. The statute (*Pamph. L.* 1906, *p.* 112; *Pamph. L.* 1907, *p.* 261) prescribes the place and manner in which the penalty shall be inflicted, and provides that the time shall be fixed in the warrant.

7. The Electrocution act (*Pamph. L.* 1906, *p.* 112) is not unconstitutional as prescribing a "cruel and unusual" punishment.

---

On error to Hunterdon County Oyer and Terminer.

For the plaintiff in error, *James M. Trimble* and *Nathan Kussy.*

For the state, *George K. Large,* prosecutor of the pleas, and *George H. Large.*

The opinion of the court was delivered by

PITNEY, J. The plaintiff in error was indicted in the Hunterdon Oyer for the murder of a woman named Delia Congilio; upon trial was found guilty of murder in the first degree, and was thereupon sentenced to death. The present writ of error is sued out to test the legality of his conviction and sentence. There are bills of exceptions sealed to certain rulings of the trial court pursuant to section 135 of the Criminal Procedure act, and there is also a certificate of "the entire record of the proceedings had upon the trial," brought up pursuant to section 136. Plaintiff in error has filed assignments of error based upon the exceptions, and has also

specified causes for reversal, as required by section 137 of the act mentioned. *Pamph. L.* 1898, *pp.* 914, 915.

The first matter requiring mention is the mode in which the jury was selected. It is specified among the causes of reversal that "the said defendant was tried by a jury drawn in the ordinary way from the general panel, and not by a jury selected from a list of forty-eight jurors drawn from the box in the presence of the judge of the Court of Quarter Sessions of said county or the clerk thereof from the general panel of jurors that had been summoned to attend at the term at which the said defendant was to be tried," &c. The reference is to the statutory requirement contained in section 82 of the Criminal Procedure act. *Pamph. L.* 1898, *p.* 897.

There is no evidence before us to support this specification. The record sets forth that the defendant was tried by a jury "impaneled and returned agreeably to the statute in such case made and provided." There is no bill of exceptions tending to negative the correctness of this recital, nor anything to show a challenge of the array. The printed book submitted to us contains a "list of the names of duly qualified jurors" drawn to serve at the term of court at which the defendant was tried, and this list appears to have been certified by the sheriff and by the judge of the Court of Common Pleas as the general panel of jurors drawn for service at the term mentioned, pursuant to section 13 of the revised act concerning juries, as amended by the act of April 21st, 1876. *Pamph. L.* 1876, *p.* 360; *Gen. Stat., p.* 1854, *pl.* 50. This list contains the names of forty-eight jurors. It forms, however, no part of the "record of the proceedings had upon the trial" within the meaning of section 136 of the Criminal Procedure act. Nor does that section admit of a review in this case with respect to the drawing of the jury, for the review is confined to error committed either in the admission or rejection of testimony, or in the charge of the court, or in the denial of any matter by the court which was a matter of discretion. The case shows no application to the discretion of the court with respect to the drawing or impaneling of the jury, and therefore, of course, no denial of a matter which

lay in the court's discretion, for where there is no request there is no denial.· *State* v. *Valentina*, 42 *Vroom* 552, 556.

The point made in the argument is that under section 82 of the Criminal Procedure act it is essential that the list of forty-eight jurors to be served upon the defendant, and from which the jury is to be selected for his trial, shall be first drawn from the box containing the names of the general panel summoned to attend as jurors at the term at which the defendant is to be tried. It may be sufficient to say that if this procedure be indeed made essential by the act, it was presumably followed in the present case, for the recital of the record that the trial jury was impaneled and returned agreeably to the statute is not overcome by anything that appears before us.

But, in our opinion, the statute does not make it essential, in cases where the general panel of jurors contains precisely forty-eight names, that these names should be put into a box and withdrawn therefrom in order to determine the names of jurors to be served upon the defendant.

The section of the Jury act already cited (*Gen. Stat.*, *p.* 1854, *pl.* 50) authorizes the Court of Common Pleas to determine how many men shall be summoned as jurors to constitute the general panel. The number summoned may be forty-eight, or may be either more or less than that number. Section 82 of the Criminal Procedure act (*Pamph. L.* 1898, *p.* 897) provides for a list of forty-eight jurors to be served upon the defendant in a capital case, and prescribes that "it shall be the duty of the sheriff or other proper officer to draw such list of forty-eight jurors, so to be served, from the box in the presence of the judge of the Court of Common Pleas of the county, or in the presence of the clerk of said court, from the general panel of jurors that may have been drawn and summoned to attend as jurors at the term at which such defendant is to be tried; but if forty-eight jurors shall not be so drawn and summoned, or if for any other reason the number of jurors drawn or summoned shall be reduced below forty-eight, then the said sheriff or officer shall add to the number so drawn and summoned as many more persons of

the body of his county qualified to serve as jurors as shall make up the number of forty-eight." Manifestly the formality of drawing the list of forty-eight jurors to be served upon the defendant is required only when the general panel consists of more than that number, the drawing being intended for the purpose of selecting forty-eight names out of a greater number. Where the general panel consists of more than forty-eight the drawing is essential. For the case of a general panel of less than forty-eight the section makes express provision. Provision is likewise made for a panel of forty-eight or more reduced below that number for any reason. In either of these cases the sheriff is to add to the number as many more names as shall make up the number of forty-eight. But where the general panel consists of forty-eight, and has not been reduced, the statute does not require the idle form of putting the forty-eight names into a box for the mere purpose of drawing out the same names.

Therefore, assuming the question to be raised by the record, we find it to be without substance.

The next point deserving mention is the admission of the testimony of one Bishop concerning statements made by the deceased, in the absence of the defendant, after the infliction of the mortal wounds. The statements were admitted as dying declarations. It is argued that they were not properly admissible as such, because not made under the sense of impending death. There was, however, evidence tending to show that shortly before the interview between Bishop and the deceased, concerning which he testified, the deceased had received certain pistol-shot wounds from which she shortly afterwards died; that she had declared that she was "wounded in the heart," and would be dead in about five minutes; that she had asked a friend to go with her to the hospital, stating that she wished to die in her arms; that a priest attended her and administered the last rites of the church, and that shortly after this ceremony the statement was made to Bishop concerning which objection is made. There was abundant evidence to justify the trial court in determining, as a matter of fact, that the deceased was under

a sense of impending death at the time the declaration was made. In *State* v. *Monich,* 45 *Vroom* 522, this court held that such a finding, if supported by any legal evidence, is not reviewable by ordinary writ of error. Nor is it reviewable under section 136 of the Criminal Procedure act (*Pamph. L.* 1898, *p.* 915) unless there was "manifest wrong and injury" to the defendant in the admission of the dying declaration. Where the finding by the trial court of the preliminary fact upon which its admissibility rests is clearly justified by the evidence, the defendant cannot be said to have suffered any wrong in the premises.

The next point to be noticed is the overruling of evidence offered by the defendant to show the general bad character of the deceased for the purpose of impeaching her veracity and thus discrediting the dying declaration. No doubt such a declaration may be discredited by showing the bad character of the declarant *for truth and veracity.* The declarant stands in this respect like any witness. Evidence of the reputation of the deceased as to truth and veracity was admitted without objection, and no such evidence was excluded. What was excluded was evidence offered as to her "general character," which was immaterial upon the question of her veracity. The rulings of the trial court in overruling this class of evidence are fully justified by the decisions in this state and by the weight of authority elsewhere. *Atwood* v. *Impson,* 5 *C. E. Gr.* 150, 157; *King.* v. *Ruckman, Id.* 316, 357; 10 *Am. & Eng. Encycl. L.* 385; 30 *Id.* 1074, 1075; 21 *Cyc.* 994; 1 *Greenl. Ev.* (*Wigmore's* 16*th ed.*), § 461a.

It is specified as cause for reversal that the judgment rendered, which is "that the said Michael Tomassi suffer death as the punishment for said crime at the time and place and in the manner prescribed by law," is void for uncertainty. Treating this specification as an assignment of error, we find it to be without merit. The law of this state does not require that the judgment shall set forth the time, place or manner of inflicting the death penalty. The Crimes act (*Pamph. L.* 1898, *p.* 825, § 108) prescribes that "every person convicted of murder in the first degree   *   *   *   shall suffer death."

The manner of inflicting the punishment was prescribed by section 127 of the Criminal Procedure act (*Pamph. L.* 1898, *p.* 911), that is, "by hanging the person convicted by the neck until dead." Nothing in either act requires that the time, place or manner of execution shall be set forth in the judgment. Electrocution was substituted for hanging by *Pamph. L.* 1906, *p.* 112, and this act requires the presiding judge to issue a warrant directed to the principal keeper of the state prison, stating the conviction and sentence, and appointing a week within which such sentence must be executed. It likewise provides for cases where execution of the sentence within the time appointed is prevented in consequence of appellate proceedings or by any other cause. The law, in short, itself prescribes the manner in which the death penalty shall be inflicted. The judgment of the court could not legitimately prescribe a different mode, nor would efficacy be added to it by stating the mode which the law prescribes.

The place of execution is prescribed by the statute itself, as amended by *Pamph. L.* 1907, *p.* 261. As to the time, this by the statute is to be set forth, not in the judgment, but in the warrant to be issued pursuant to the judgment, and this warrant is to appoint a week within which the sentence must be executed, unless prevented by appeal or other cause. The week so appointed must begin not less than four weeks and not more than eight weeks after the issuing of the warrant. The time of execution within that week is left to the discretion of the principal keeper of the state prison, who is the executive officer.

The common law did not require the time and place of execution to be prescribed by the judgment, but by statute (25 *Geo. II., ch.* 37; 7 *Stat. at L.* 440) it was enacted that all persons found guilty of willful murder be executed according to law on the next day but one after sentence passed, unless the same should happen to be Sunday, and in that case on the Monday following, "in which sentence shall be expressed not only the usual judgment of death, but also the time appointed hereby for the execution thereof." The practice since pursued of setting forth in the judgment the time

and place of execution seems to have arisen from this statute. See 4 *Bl. Com.* 206, 403 ; *appendix, p.* 4. In *Roesel* v. *State,* 33 *Vroom* 368, this court recognized that the fixing of the time and place for hanging the convict was distinct and separate from the judgment, and related only to the execution of the judgment. See, also, *State* v. *Tolla,* 44 *Id.* 249, 251. So, in *Clifford* v. *Heller,* 34 *Id.* 105, it was declared that by the common law the time and place of execution were not named in the sentence, but left to the judgment and discretion of the sheriff.

Nor does the confiding of a discretion to the ministerial officer respecting the date of executing the sentence amount to the delegation of a judicial function. It is a mere matter of convenience that almost of necessity is left to be arranged by him to whom the process of execution is directed. By the common practice in other cases a writ of execution leaves the officer free to perform its mandate at any time prior to the return day, so long as he exercises due diligence in the premises. The Electrocution act limits the discretion by confining the time of execution to an appointed week, but no judicial function is thereby conferred. The choice of time, within the week, is purely a ministerial function.

But finally it is argued that the so-called Electrocution act is in contravention of our constitution (*art. I., pl.* 15), which declares that "cruel and unusual punishments shall not be inflicted." The act (*Pamph. L.* 1906, *p.* 112) prescribes that the punishment of death must be inflicted "by causing to pass through the body of the convict a current of electricity of sufficient intensity to cause death as speedily as possible, and the application of such current must be continued until such convict is dead."

It is not easy to define what punishments are "cruel and unusual" within the constitutional inhibition. In a limited sense, anything is cruel which is calculated to give pain or distress, and since punishment imports pain or suffering to the convict, it may be said that all punishments are in some sense cruel. But, of course, the constitution does not mean that crime for this reason is to go unpunished. On the con-

trary, it plainly contemplates that crime can only be effectively deterred by inflicting some sort of pain or suffering upon the convicted offender.

By the common law, murder, and indeed many crimes much less serious, were punished by death. This is still the punishment under our law for the crime of murder in the first degree. It is absurd to suppose that the constitution prohibits it. Therefore it is open to the legislature to determine some mode in which the death penalty may be inflicted. Instead of hanging by the neck, they have now provided that death shall be caused as speedily as possible by the direct application of electricity to the body of the convict. On its face the statute imports an effort by the lawmaking body to mitigate the pain and suffering of the convict. We cannot assume that death by the electric current is a cruel punishment in the constitutional sense. A similar statute has been sustained by the Court of Appeals of New York upon reasoning that seems to us incontrovertible. *People* v. *Durston,* 119 *N. Y.* 569; *People* v. *Kemmler, Id.* 580, 587. See, also, *In re Kemmler,* 136 *U. S.* 436.

It is further argued, however, that there is cruelty in section 5 of the act (*Pamph. L.* 1906, *p.* 113), which prescribes that during the weeks intervening between the issuing of the warrant and its execution the person sentenced shall be kept in solitary confinement, and that no person shall be allowed access to him, without order of the court, excepting the officers of the prison, his counsel, his physician, a priest or minister of religion, if he shall desire one, and the members of his family. We are unable to see that in such confinement there is cruelty within the constitutional inhibition. Confinement of the prisoner is, of course, necessary pending the execution of the sentence, and it is within the province of the legislature to require that he be kept in seclusion. A more stringent provision for solitary confinement pending execution is contained in the act of George II. above cited.

A few other points were raised in argument and have been duly considered. They are without substance, and require no particular mention.

The judgment under review should be affirmed.

*For affirmance*—MAGIE, CHANCELLOR, THE CHIEF JUS-
TICE, GARRISON, HENDRICKSON, PITNEY, SWAYZE, TRENCH-
ARD, BERGEN, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY,
DILL, J.J. 14.

*For reversal*—None.