[Criminal No. 794.   Filed April 26, 1934.]

[32 Pac. (2d) 18.]

# MANUEL HERNANDEZ, Appellant, v. STATE, Respondent.

Mr. H. G. Richardson, for Appellant.

Mr. Arthur T. La Prade, Attorney General, Mr. John Francis Connor, Assistant Attorney General, and Mr. W. E. Truman, County Attorney, for the State.

McALISTER, J. — Manuel Hernandez and his brother Fred Hernandez were jointly charged by information with the crime of murdering one Charles P. Washburn. Both were convicted of murder in the first degree and given the death penalty. They were tried separately and have brought their convictions here in separate appeals.

No controversy exists as to the killing or the manner in which it was done. A written statement by the defendant admitting it and describing it in detail was received in evidence and it appears from it that on Saturday, January 21, 1933, Manuel and

Fred left their mother's home some four or five miles east of Casa Grande, Pinal county, Arizona, for the purpose of hunting rabbits and that as they were walking along or near the Casa Grande-Tucson highway they saw a prospector's camp about 300 yards south of this road where an old man, later shown to be Charles P. Washburn, was sitting on a box by a fire outside a tent. Seeing him there alone the boys conceived the idea of going over and robbing him. On their way to where he was Fred picked up from a trash pile an iron Ford spindle and when they reached him, Manuel, in accordance with their previous arrangement, engaged him in conversation, while Fred, after sneaking up and standing somewhat to his rear for a very short while, struck him over the head with the spindle, the result being that he fell unconscious to the ground. They then dragged him on his back in a southeasterly direction about 170 yards and stopped, whereupon Manuel, to make sure that he was dead, shot him in the head, scattering a part of his brains on the ground and taking instantly whatever of life may have been left in him. They pulled his lifeless body a short distance farther on and after taking from his pockets seven five-dollar bills, dumped it in an old abandoned well 10 or 15 feet in depth and then covered it with brush and dirt.

Following this the boys returned to the prospector's camp and drove away his Model T Ford truck, but it went only a few hundred yards when its wheels went down several inches in mud and was abandoned by them. From there they went to their home, but before reaching it threw their gun into a mesquite brush. Manuel remained there about one-half hour and then went to Casa Grande from where he and Fred went by Coolidge to Chandler and remained until Wednesday when they returned to their

mother's. Fred stayed there but Manuel went back to Chandler where he was arrested.

The day following the death of Washburn his body was discovered and two or three days later the shotgun which the boys threw away was found. The officers learned that it had been in the possession of the two Hernandez boys and soon afterwards arrested Fred and took him to Casa Grande where he admitted the crime and told the officers his brother, Manuel, who was with him at the time, could be found at Chandler. The latter was arrested within a short time thereafter and both boys taken to Florence and placed in jail.

On January 31st following, Manuel made and signed a full statement relative to the crime which was introduced in evidence, and the testimony received at the trial was corroborative of it. Manuel was a witness in his own behalf but did not deny or repudiate anything contained in his signed confession. He did state, however, that after he and his brother left the house that morning they drank two pints of whisky they had hid some distance from the house three or four days before, though he said nothing about this in his written statement and several persons testified that he stated on January 31st that he had not been drinking the day of the killing. It was not contended at the trial nor is it here that the defendant should not have been convicted of murder in the first degree but the claim is that, due to the extreme youth of him and his brother Fred, seventeen and eighteen years respectively, and to the further fact that at the time of the killing they were under the influence of intoxicating liquor, the penalty inflicted might have been life imprisonment instead of death if the court had properly instructed the jury.

Most of the assignments are based on the court's refusal to give certain instructions and the giving of others. The defendant requested a number which dealt with the duty of the jury in fixing the punishment in case it found the defendant guilty of murder in the first degree but the court declined to give them, and the first seven assignments grow out of this refusal. Under the statutes of this state murder is divided into murder in the first degree and murder in the second degree, the first being punishable by death or life imprisonment, the choice between the two being in the discretion of the jury trying the case. Its duty in this respect is prescribed by section 4585, Revised Code of 1928, reading as follows:

"*Punishment.* Every person guilty of murder in the first degree shall suffer death or imprisonment in the state prison for life, at the discretion of the jury trying the same, or, upon the plea of guilty, the court shall determine the same; and every person guilty of murder in the second degree is punishable by imprisonment in the state prison not less than ten years."

It is clear from this that the question of punishment in first degree murder cases is wholly within the jury's discretion and that the court has no duty in connection therewith other than to advise it that it must determine which of the penalties—death or life imprisonment—shall be imposed upon the defendant if it finds him guilty of that offense. The instructions refused, however, were requested upon the theory that it was the court's duty to inform the jury that it might fix the defendant's punishment at life imprisonment in case it found him guilty of murder in the first degree and extenuating or mitigating circumstances were shown. This was in effect asking the court to advise the jury when it was proper for it to fix the death penalty and when life imprisonment, in convictions for this offense, a matter that

the statute leaves solely to the discretion of that body.

Such a request also overlooks the fact that prescribing punishment in the alternative does not have the effect of creating two grades of the offense, one of which is punishable by death and the other by life imprisonment. The crime, notwithstanding this form of punishment, is still single and not divided into degrees; hence, the court, when it has instructed the jury as to the elements constituting the offense and advised it that it must, in case it finds the defendant guilty, determine which of these punishments shall be imposed, has exhausted its powers in the premises, and any attempt on its part to go further and inform the jury that under certain circumstances it might impose death and under others life imprisonment would in effect usurp the prerogatives of the jury and be wholly improper. A choice between these two penalties having been committed to the jury, it should be permitted to discharge this function unaffected and uninfluenced by any statement of the court as to what portions of the evidence it shall consider in determining the matter. "This discretion," to use the succinct but correct statement of the rule in *People* v. *Kamaunu,* 110 Cal. 609, 42 Pac. 1090, 1091, which is followed in effect by practically all the courts, "is given to the jury, and the court cannot direct or advise them upon the subject further than to inform them of their function." See the following: *Grant* v. *State,* 124 Ga. 757, 53 S. E. 334; *Winston* v. *United States,* 172 U. S. 303, 19 Sup. Ct. 212, 43 L. Ed. 456; *State* v. *Thorne,* 39 Utah 208, 117 Pac. 58; Id., 41 Utah 414, 126 Pac. 286, Ann. Cas. 1915D 90; *Cohen* v. *State,* 116 Ga. 573, 42 S. E. 781; *State* v. *Bosworth,* 86 Vt. 71, 83 Atl. 657; *Garner* v. *State,* 28 Fla. 113, 9 So. 835, 29 Am. St. Rep. 232;

*United States* v. *Williams,* (D. C.) 103 Fed. 938; *People* v. *Ross,* 134 Cal. 256, 66 Pac. 229.

To support his contention the defendant relies upon the decisions of the courts of California from which section 4585, *supra,* was taken, but we have been cited to no case from that jurisdiction holding it error to deny a request for such an instruction, though the Supreme Court of that state has refused several times to say that it was reversible error to give it. In its last statement on the subject, which appears in *People* v. *Bollinger,* 196 Cal. 191, 237 Pac. 25, it advises the trial courts of that state, after stating that such an instruction is not erroneous, that the "practice of giving such charge should be abandoned," because "in our opinion, the trial court should never instruct the jury as to how the discretion should be exercised." The court, after pointing out the cases in which it has been called upon to consider the question, uses this language:

"We have, however, gone into the subject in the hope, if not the expectation, that the practice of giving such instructions may be abated, thus giving assurance that the penalty reflects the decision of the jury alone, and at the same time sparing this court the necessity of repeatedly passing on such assignments of error. And considering the numerous occasions this court has held that section 190 of the Penal Code confers on the jury alone the discretion of determining the punishment in cases of guilt of murder in the first degree, trial courts, especially where a human life is at stake, should not interfere with the discharge of that solemn duty by the jury."

The refusal of an instruction defining the word, "discretion," as used in section 4585, *supra,* is assigned as error, the ground therefor being that it is a technical term and may not have been comprehended by the jurors who were not professional

people. The court did not, in advising the jury that it was its duty to fix the punishment in case it found the defendant guilty of murder in the first degree, read this section of the Code but used the following language:

"I instruct you, gentlemen, that in the event your verdict should be that of murder in the first degree, that it becomes your duty to fix the punishment of the defendant at either death or life imprisonment. If your verdict should be that of guilty of murder of the second degree or manslaughter then you are not concerned with the punishment because it then becomes the duty of the Court to fix the punishment."

The purport of this statement could not have been mistaken by any juror. To have read section 4585 and followed it with a definition of the word, "discretion," would have been perfectly proper, but would have made the jury's duty no clearer or plainer.

The giving of instruction No. 8 is assigned as error. In it the court told the jury that all persons, "except idiots, lunatics and insane persons and children under the age of fourteen years, are presumed to be capable of committing crime," and that everyone is presumed to be sane and to intend the natural and usual consequences of his own acts. Then followed the statement that "the age of this defendant is to be considered by you only for the purposes of determining whether or not he had, at the time of the alleged crime, sufficient mental capacity to entertain a criminal intent; that is, to distinguish between right and wrong, and sufficient mental capacity to intend to do the wrongful act charged in the information." The court was advising the jury merely as to who is capable of committing crime, not as to the punishment for it, and in effect told it that the true test is the mental capacity of the person, not his age, but

that in determining his capacity his age might be considered since it might be that his years were such as to throw light on the question whether he could in fact distinguish between right and wrong and intend to do the wrongful act with which he was charged. There is no other ground upon which age may be admitted and considered, but the fact that it might aid in showing capacity to commit the crime he is accused of is all that is needed to authorize the jury to consider it in choosing the punishment. Undoubtedly one of the principal considerations that actuate or guide juries in making this choice is the question of the defendant's capacity, and this is true whether any lack thereof may be suggested by youth, old age or mental weakness.

In instruction No. 10 the court told the jury that it could return any one of these five verdicts: 1, Guilty of murder in the first degree and place the punishment at death; 2, guilty of murder in the first degree and place the punishment at life imprisonment; 3, guilty of murder in the second degree; 4, guilty of manslaughter; 5, not guilty. The defendant contends that this was error, his ground being that the court should have advised the jury that it could return a sixth verdict, "guilty of murder in the first degree," without designating any penalty. To support this view it cites *People* v. *Perry,* 195 Cal. 623, 234 Pac. 890, in which a verdict in this form was returned and the court treated it as equivalent to a verdict of murder in the first degree and fixed the punishment at death. However, the court had instructed the jury that if it returned such a verdict the death penalty would be imposed by the court and that if it desired the defendant to be relieved of the death sentence it should in returning its verdict fix the penalty at imprisonment. *People* v. *Bollinger, supra.* This was merely a different method of re-

quiring the jury to fix the penalty in a first degree murder case and is not applicable where the jury is furnished with two first degree murder verdicts, one of which imposes the death penalty and the other life imprisonment with instruction to impose one or the other in case it found murder in the first degree. If such a verdict should be returned without designating the punishment, unless the court had given an instruction similar to that in the Perry and Bollinger cases, *supra*, it would be the duty of the court to direct the jury to deliberate further and fix the penalty.

On February 8, 1933, the defendant and his brother waived a preliminary hearing and the magistrate before whom they were taken held them to answer without bail. On April 4th thereafter a hearing was had before the superior court of Pinal county on a motion to set aside the information, the ground therefor being that they had not been legally committed or held to answer for the reason, first, that no one was appointed to interpret the proceedings for them though they did not understand the English language, and, second, that they were not represented by an attorney or advised by the magistrate that they could have one appointed for this purpose.

It is true, as defendant contends, that section 4469, Revised Code of 1928, provides that the court may, when necessary, appoint an interpreter and that section 4948 of the same Code makes it the duty of a magistrate before whom a defendant is brought charged with an offense a justice of the peace has not the jurisdiction to try, to inform him of the accusation against him and of his right to the aid of counsel at every stage of the proceedings, and, if necessary, allow time to send for counsel, or, if required therefor, postpone the examination. The record of the proceedings at the preliminary, however, dis-

closes that the magistrate complied with these provisions and, hence, that there was no error in refusing to set aside the information.

It appears that on January 31st, eight days before the preliminary, the defendant signed a written statement describing the crime in detail and that on the day of the hearing, just before he was taken over to Casa Grande for that purpose, he and his brother were fully informed by the county attorney in Florence as to the nature of the preliminary hearing, their right to waive it if they cared to, and the effect of their doing so. They were also told by him that the court at Casa Grande had the authority to appoint an attorney to represent them at that hearing and that they could insist on one being appointed if they wished to, but they both stated that they would waive the preliminary hearing and that they did not want an attorney. This was explained to them in both English and Spanish in the presence of several persons.

They appeared before the magistrate at Casa Grande for the preliminary hearing an hour or two after this conversation and he, in compliance with the statute, also informed them what the charge against them was, read them the complaint in full and advised them of their right to have an attorney. He explained to them, and had the deputy county attorney also explain, the meaning of the terms, "preliminary hearing" and "waiver," and when this had been done and they had stated that they understood what had been said, they informed him that they did not care to have an attorney and that they would waive their preliminary hearing. The magistrate used the English language in talking to them, and testified that they understood what he said, and, according to both the interpreter of the superior court and the county attorney of the county, both of whom

speak Spanish fluently and had talked to the defendants in that language, they understood English fairly well, the defendant, Manuel, somewhat better than the older brother Fred. Several other witnesses testified on this point and they were each of the view that the defendants knew the purport of the proceedings. From a reading of the full record of the hearing on the motion to set aside the information we think it clear, therefore, that the defendants understood what they were doing when they stated that they waived the preliminary hearing and did not want an attorney.

In addition, it is perfectly apparent from the entire record that no order other than one holding them to answer without bail could have been entered by the magistrate, and that the setting aside of the information and the holding of another preliminary could not have changed this fact. Just how the defendant, in view of his statement at the preliminary and the circumstances known to the state at the time, could have been prejudiced by the failure to appoint someone to interpret the proceedings or an attorney to represent him at that hearing does not appear. To have granted the motion to set aside the information and have ordered another hearing would under these circumstances have meant nothing but deference to the merest formality. The assignment is wholly without merit. No error appearing, the judgment is affirmed.

Inasmuch as the judgment that the defendant is guilty of murder in the first degree is without prejudicial error and the penalty fixed therefor, death, must be carried out, it becomes necessary to determine whether this shall be done by hanging or by administering lethal gas. This necessity arises because paragraph 5129, Revised Code of 1928, which provides that ''punishment of death must be inflicted

by hanging," was superseded on October 28, 1933, following a vote of the people on that subject, by an amendment to the Constitution of this state designated as section 22, article 22, and reading as follows:

"Sec. 22. The judgment of death shall be inflicted by administering lethal gas. The execution shall take place within the limits of the State prison."

Section 5151, Revised Code of 1928, makes it the the duty of this court, in case it affirms a judgment imposing the death penalty and the time for the execution thereof shall have passed before the judgment of affirmance, to fix in its judgment the time when the original sentence of death shall be executed, and inasmuch as the superintendent of the state prison must know, in addition to the time of its execution, the manner thereof, the determination of the question, whether hanging or administering lethal gas shall be the method of carrying it out, becomes necessary.

It is contended by defendant, however, that even though the court affirm the judgment imposing a sentence of death to be inflicted by hanging, that order cannot now be carried out because the constitutional amendment has abolished hanging and provided in its stead that the only method of inflicting the death penalty shall be by administering lethal gas. If the change had been accomplished merely through a statutory enactment there could arise no question, because under section 5308, Revised Code of 1928, and perhaps the general law, the method of executing the sentence of death prescribed at the time the offense was committed, rather than at the time of the imposition of sentence, would prevail. But this is not true when the change in method is made by incorporating in the fundamental law a provision to that effect and there is nothing in the language making the change indicating that it is to apply only to

crimes perpetrated thereafter. Inasmuch, therefore, as the Constitution has, since October 28, 1933, contained a provision that the death penalty shall be inflicted by administering lethal gas without making any exception, we are of the view that it was intended by the framers of this amendment and the people in approving it that this method should be used in all cases following that date, whether the crime for which such a sentence is imposed was committed prior thereto or not.

It is suggested, however, that if this be the correct rule the amendment prescribing lethal gas violates the provisions of both the federal and state Constitutions (article 1, section 10, and article 2, section 25, respectively) prohibiting the passage of *ex post facto* laws. Having become a part of the state's fundamental law it could not, of course, contravene that instrument in any particular but would supersede any provision therein that was in conflict with it, and, basing our view upon the construction placed on the term, *ex post facto,* as used in the Federal Constitution, we think it very clear that it does not run counter to that either. In one of the early decisions of the United States Supreme Court, *Calder* v. *Bull,* 3 Dall. (U. S.) 386, 390, 1 L. Ed. 648, the definition of the term, *ex post facto,* as used there, and this has been followed since by practically all the courts and law writers, is in this language:

"1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender."

The only one of these four subdivisions that could be considered in connection with the matter confronting us here is the third which refers to laws changing the punishment for a crime. The amendment in question, however, does not even attempt to do this but is predicated upon the fact that first degree murder is still punishable by death, that is, when the jury, or the judge upon a plea of guilty, decides to impose it; all it does is to change the method of inflicting that penalty. And it is clear from a reading of the authorities that a law which does no more than this, so long as it has the effect of mollifying the rigor of the old method of execution, is not an *ex post facto* law. Such was the holding of the court in *Calder* v. *Bull, supra*. In discussing the question it said:

"But I do not consider any law *ex post facto,* within the prohibition, that mollifies the rigor of the criminal law; but only those that create or aggravate the crime; or increase the punishment, or change the rules of evidence, for the purpose of conviction."

In 1912, or more than a hundred years after this language was used, the same court quoted it in *Malloy* v. *State of South Carolina*, 237 U. S. 180, 35 Sup. Ct. 507, 508, 59 L. Ed. 905, and then said: "And to the general doctrine thus announced this court has continued to adhere." The occasion for this announcement arose when the court was called upon to determine whether a law providing that the death penalty should be inflicted by electrocution was *ex post facto* as to one who had committed the crime of murder when the statute required that it be carried out by hanging. The conclusion was that the punishment was not increased by the change but was in fact mollified to some extent and, therefore, that the law providing for it did not come within the constitutional provision prohibiting the passage of an *ex*

*post facto* law. Among the reasons assigned for this holding was the well grounded belief that electrocution is less painful and more humane than hanging, as the following excerpt from the opinion will show:

"Impressed with the serious objection to executions by hanging, and hopeful that means might be found for taking life 'in a less barbarous manner,' the governor of New York brought the subject to the attention of the legislature in 1885. A commission thereafter appointed to ascertain the most humane and practical method of inflicting the death sentence reported in favor of electrocution. This was adopted by the statute of 1888, and, with the approval of the courts, has been in continuous use since that time. . . . Influenced by the results in New York, eleven other states have adopted the same mode for inflicting death in capital cases."

See the following: *In re Kemmler,* 136 U. S. 436, 10 Sup. Ct. 930, 34 L. Ed. 519; *People ex rel. Kemmler* v. *Durston,* 119 N. Y. 569, 24 N. E. 6, 16 Am. St. Rep. 859, 7 L. R. A. 715; *People* v. *Hayes,* 140 N. Y. 484, 35 N. E. 951, 37 Am. St. Rep. 572, 23 L. R. A. 830; *Duncan* v. *State of Missouri,* 152 U. S. 377, 14 Sup. Ct. 570, 38 L. Ed. 485; *State of North Carolina* v. *Mallett,* 125 N. C. 718, 34 S. E. 651; *State* v. *Kavanaugh,* 32 N. M. 404, 258 Pac. 209, 53 A. L. R. 706; *Storti* v. *Commonwealth,* 178 Mass. 549, 60 N. E. 210, 52 L. R. A. 520; *State* v. *Tomassi,* 75 N. J. Law 739, 69 Atl. 214.

It being true, therefore, that electrocution has been adopted by a number of states as a method of inflicting the death penalty upon the theory that it is less painful and more humane than hanging and that the courts, which have been called upon to determine whether such acts constitute *ex post facto* laws or prescribe cruel or unusual punishment, have held that they do neither, there would appear to be no

question but that the use of lethal gas for this purpose is also "more humane and less barbarous" than hanging. Such is the theory upon which the legislature of the state of Nevada adopted it and the Supreme Court of that state upheld it in *State.* v. *Gee Jon,* 46 Nev. 418, 211 Pac. 676, 682, 217 Pac. 587, 30 A. L. R. 1443. In holding it valid the court said that in passing it the legislative branch of the government "sought to provide a method of inflicting the death penalty in the most humane manner known to modern science," and that it did not violate the federal or state constitutional provision against cruel and unusual punishment. In declining to accept the view that execution by lethal gas is a cruel and inhuman method of enforcing the death penalty it said, among other things:

"Without undertaking to state the limitations of the rule invoked, we may say that if we are controlled by our scientific knowledge of the subject we must reject counsel's contention. For many years animals have been put to death painlessly by the administration of poisonous gas. Gas has been used for years by dental surgeons for the purpose of extracting teeth painlessly. No doubt gas may be administered so as to produce intense suffering. It is also true that one may be executed by hanging, shooting, or electrocution in such a bungling fashion as to produce the same result. But this is no argument against execution by either method. . . . It may be said to be a scientific fact that a painless death may be caused by the administration of lethal gas."

Nothing more need be said to show the fallacy of the further suggestion that the use of lethal gas for the infliction of the death penalty violates the eighth amendment to the Federal Constitution. The fact that it is less painful and more humane than hanging is all that is required to refute completely the charge that it constitutes cruel and unusual punishment

within the meaning of this expression as used in that amendment.

It follows from the foregoing that section 22, article 22, providing for the use of lethal gas in executing the death sentence, neither constitutes an *ex post facto* law nor prescribes cruel and unusual punishment and, therefore, that it conflicts in no sense with the Federal Constitution prohibiting legislation that has either effect.

ROSS and LOCKWOOD, JJ., concur.