■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DOLORES DONOVAN, Appellant. — Appeal by defendant from a judgment of the County Court, Nassau County (Santagata, J.), rendered December 12, 1980, convicting her of criminal sale of a controlled substance in the first degree and criminal possession of a controlled substance in the first degree, upon a jury verdict, and imposing sentence. Judgment affirmed. Although we are sympathetic to defendant's argument that the sentences imposed herein of concurrent terms of 15 years' to life imprisonment (Penal Law, §§ 220.21; 220.43) are particularly severe and harsh under the circumstances of this case, we are constrained by *People v Broadie* (37 NY2d 100, cert den 423 US 950), in which the mandatory sentencing statutes for drug-related offenses were found not to be so disproportionate to the offenses as to be unconstitutional. The sentences must therefore be affirmed. We have considered defendant's remaining allegations and find them to be without merit. Gulotta, Brown and Niehoff, JJ., concur.

Mollen, P. J., dissents and votes to modify the judgment by vacating the sentences and remitting the matter for resentencing, with the following memorandum: Like the majority, I too am "sympathetic to defendant's argument that the sentences imposed [upon her] * * * are particularly severe and harsh." I would go further, however, and hold that, under the circumstances of this case, the sentences offend the constitutional proscription against cruel and unusual punishment. It is now settled that, whatever the wisdom and efficacy of the inflexible sentencing structure of this State's narcotics laws, the statutory scheme under which the defendant here was convicted and sentenced suffers from no inherent constitutional infirmity (see *People v Broadie,* 37 NY2d 100, cert den 423 US 950). Nevertheless, our Court of Appeals has acknowledged that "in some rare case on its particular facts it may * * * be found that the statute has been unconstitutionally applied" (*id.,* at p 119). In my view, this is such a case. Accordingly, I respectfully dissent and cast my vote to modify the judgment by vacating the sentences and remitting the case in order to permit the County Court to resentence the defendant without the constraint of a mandatory 15-year minimum sentence. The case against the defendant arose out of an investigation of one Jeff Kjellgren by the Long Island Drug Enforcement Task Force. Kjellgren was both a heavy user and prolific dealer of narcotics. He frequently smoked marihuana and hashish, and took speed, LSD, mescaline and cocaine as well. Moreover, beginning in September, 1977, he engaged in the sale of marihuana and hashish, and on occasion cocaine, conducting most of his trade out of his parents' Westbury home. He

stored his drugs in a concealed closet built behind a bookcase. He became well versed in the metric system to enable him to convert drug weights. He became proficient in diluting cocaine with mannitol for sale. He kept a shotgun in the house for protection. Kjellgren obtained drugs for use and sale from various sources and, in April, 1979, he secured a quantity of cocaine from an individual in Manhattan. He sold that cocaine to an undercover officer on April 19, 1979. On May 14, 1979, the same undercover officer sought to purchase an additional four ounces of cocaine from Kjellgren. Kjellgren told the officer that he did not have that quantity available but would get in touch with him in a few days after he had checked several sources. Three days later, Kjellgren contacted the officer and told him that he would be able to sell four ounces of cocaine for $7,000. The sale was to be consummated the following evening at Kjellgren's home. At approximately 10:15 P.M. on the appointed day, officers observed the defendant arrive alone at Kjellgren's house in a small white car. She drove into his garage and the door was closed behind her. Some 10 minutes later, the undercover officer called Kjellgren and was told that the cocaine had arrived. The officer was directed to come right over. When the officer arrived at the house, Kjellgren produced two ounces of cocaine. He told the officer that his "connection" was in the garage and wanted the sale to be carried out in two separate transactions. When the officer protested, Kjellgren relented and told him that he would obtain the other two ounces from his "connection" in the garage. Kjellgren then left the room and returned with four ounces of cocaine which he handed to the officer. As Kjellgren walked outside toward the officer's car to collect the purchase price for the drugs, he was placed under arrest. Several police officers then immediately descended upon Kjellgren's garage and arrested the defendant, who was sitting in the driver's seat of her car. The officers subsequently discovered $1,700 in cash in her pocketbook together with several pieces of paper, one of which contained notes made in Kjellgren's handwriting. The notes appeared to be calculations representing metric conversion from pounds to grams. Following the arrests, the substance given to the officer was subjected to analysis. It was confirmed that the officer had received just under four ounces of a substance which was 20.5% cocaine. Charged with criminal sale of a controlled substance in the first degree, and criminal possession of a controlled substance in the first and third degrees, the defendant rejected plea offers and proceeded to trial. The undercover officer and his backup team testified as to the afore-mentioned events. The primary witness against the defendant, however, was Jeff Kjellgren. He had agreed to co-operate with the authorities in return for a sentence of lifetime probation — a sentence which he ultimately received. Kjellgren testified that two days after promising to supply the undercover officer with the drugs, he telephoned the defendant and asked if she could obtain four ounces of cocaine for him. According to Kjellgren, the defendant replied that she would probably be able to do so. Later that evening she came to Kjellgren's home and agreed to provide the cocaine to him for a price of between $5,800 and $5,900. Kjellgren testified further that, on the day of the sale, the defendant arrived at his home and announced that she had been able to obtain the cocaine. She then gave him two ounces, telling him that she wanted the sale split into two transactions involving two ounces each. Kjellgren agreed and brought the two ounces from the garage to the house. According to Kjellgren, when the officer insisted that there be one transaction for the entire four ounces, Kjellgren returned to the garage and obtained the remaining cocaine from the defendant. The defendant testified in her own behalf and asserted that she knew nothing about the cocaine transaction and had been at Kjellgren's home for social purposes only. She claimed that she had remained in the garage because Kjellgren had asked

her to do so, telling her that he did not want her to meet the individuals who were then in his home. The defendant admitted possessing the $1,700 found in her pocketbook, but claimed that she was holding it as a favor for Kjellgren. She further testified that she knew nothing of the pieces of paper allegedly found in her pocketbook. In addition to the defendant's testimony, the defense presented three character witnesses. Thereafter, the People in rebuttal called a police officer who testified that the defendant had told him that she could not reveal the source of the cocaine because, if she did, she would be killed. Following summations and the court's charge, the case went to the jury. At the end of the first day of deliberations, the jurors reported that they were deadlocked, with eight votes for acquittal, four for conviction. The next morning the jury again reported that it was hopelessly deadlocked at that vote. Deliberations continued, however, and at the end of the second day a verdict of guilty was returned. Thereafter, the court, with some reluctance, imposed two mandatory concurrent sentences of 15 years to life. On appeal, the defendant maintains, *inter alia,* that a mandatory sentence of not less than 15 years' imprisonment constitutes cruel and unusual punishment under the circumstances of her case. Since the advent of the mandatory sentencing structure in narcotics cases, there have been a number of cases in which the imposition of mandatory sentences has been held unconstitutional as applied. The defendant contends that she falls within the holdings of such cases, and after careful consideration, I find myself in agreement with her. A survey of the cases in the area suggests a number of factors which the courts have considered in determining whether a mandatory sentence is unconstitutional in a particular case. Among those factors are (1) the nature, whether peripheral or central, of the defendant's participation in the drug transaction, (2) the defendant's character and prior record, (3) the motivation for the defendant's conduct, as, for example, whether it grew out of a sense of loyalty, affection or obligation to the primary participant in the crime, (4) any large disparity between the sentences to be imposed upon the defendant and sentences imposed upon codefendants who were equally or more culpable, and (5) any large disparity between the sentence offered the defendant as part of a plea bargain and the sentence mandated after a jury conviction — this suggesting the imposition of a severe penalty for insisting upon the right to a trial (see, e.g., *People v Robinson,* 68 AD2d 413; *People v Askew,* 93 Misc 2d 754; *People v Catalano,* 101 Misc 2d 436, revd on other grounds 80 AD2d 587; *People v Krich,* NYLJ, Feb. 10, 1982, p 12, col 4; *People v Garcia,* NYLJ, June 24, 1982, p 12, col 1; see, also, *People v Jones,* 39 NY2d 694, 698-702 [Breitel, Ch. J., dissenting]; *People v Askew,* 66 AD2d 710, 710-714 [Fein, J., concurring]; *People v Mansell,* 79 AD2d 582, 582-583 [Sandler, J., dissenting]). With these criteria in mind, I turn to the case at bar. The record reveals that the defendant is a 32-year-old divorced mother of three small children. Her only prior involvement with the law occurred in 1967 when she was convicted of disorderly conduct and received a $25 fine. Both the court and the Probation Department received many letters from members of the defendant's community attesting to her reputation as a concerned and good parent who is deeply involved in community and church activities. Apparently, the defendant's connection with Kjellgren was a social one. She was dating him, and claimed to have been planning to go with him to a concert on the day she was arrested. Following her arrest, she was approached by the authorities who attempted to induce her to co-operate in the investigation of drug offenses. The only co-operation she gave, however, was a statement describing the events leading to her arrest. She told the investigator that Kjellgren had asked her if she could obtain some cocaine because he needed money and had two potential buyers. When the defendant

told him that it was not a good idea, he insisted and she agreed to try to get the drugs for him. She then called the home of one Bobby Fooks and spoke to his wife. She told her that she needed four ounces of cocaine, and Mrs. Fooks agreed to speak to her husband. Later Fooks called the defendant and said that he might be able to obtain the narcotics. Thereafter, he did deliver four ounces to the defendant, and she called Kjellgren. She brought the cocaine to him and told him that Fooks required payment of $5,500. According to the defendant, she was unable to provide the authorities with further information because she had no further knowledge concerning drug dealing. This handicap was obviously not shared by Kjellgren who, deeply involved in drug traffic, was able to provide information, and thereby to escape a 15-year minimum sentence and receive instead a term of lifetime probation. The record further reveals that not long after her indictment the defendant was offered a plea to an A-II felony with a promised minimum term of three years. She refused the offer and a suppression hearing was held. Following the hearing, the court suppressed the defendant's statement, and the prosecution then offered to consent to a plea to an A-III felony. Had the defendant agreed to enter that plea, the bargain called for a sentence of only one to three years' imprisonment. In sum, then, the defendant is a woman without prior serious conflict with the law. There is no evidence, apart from uncorroborated and unsworn accusations by Kjellgren, that she had any prior drug dealings. Indeed, the probation report itself concludes with the observation that "[i]t would appear that despite the damaging statement of [Kjellgren] * * * the instant offense is out of character with the defendant's normal behavior." The defendant's role in the transaction at bar seems to have been peripheral, since she simply made inquiries for her erstwhile boyfriend and acted as a courier for him in his attempt to obtain drugs. Moreover, she was plainly penalized for insisting on her right to a trial, since she received a 15-year to life sentence rather than a term of from one to three years offered as part of a plea bargain. And, significantly, the main actor in the transaction, Jeff Kjellgren, a large-scale drug dealer, received a sentence of lifetime probation. Considering all these circumstances, and assessing them against the appropriate criteria, I cannot avoid the conclusion that, as applied to the defendant herein, the sentences requiring her incarceration of no less than 15 years constituted cruel and unusual punishment and therefore are unconstitutional.