83 N.Y.2d 477 (1994)
633 N.E.2d 1074
611 N.Y.S.2d 470
The People of the State of New York, Appellant,
v.
Angela C. Thompson, Respondent.
Court of Appeals of the State of New York.
Argued February 10, 1994.
Decided March 30, 1994.
Robert M. Morgenthau, District Attorney of New York County, New York City (Donald J. Siewert and Mark Dwyer of counsel), for appellant.
Ronald R. Laskorski, Scarsdale, and Larry J. Sheehan for respondent.
Chief Judge KAYE and Judges SIMONS and SMITH concur with Judge LEVINE; Judge BELLACOSA dissents and votes to affirm in a separate opinion in which Judge CIPARICK concurs; Judge TITONE taking no part.
*479 LEVINE, J.
Defendant was indicted and convicted after trial of the sale of two ounces, 33 grains of cocaine (a class A-I felony) to an undercover police officer on August 31, 1988. The trial testimony established that, in a known drug location, defendant sold the undercover officer 214 vials of cocaine for $2,000 and promised to "take care of" him "the next time" he came. At the time of the sale she was 17 years old. Conviction of a class A-I felony carries a mandatory indeterminate prison sentence, the minimum of which is not less than 15 years and not more than 25 years, the maximum of which is life imprisonment (Penal Law § 70.00 [2] [a]; [3] [a] [i]). The trial court, however, determined that in defendant's case, imposing even the minimum mandatory sentence of 15 years to life would constitute cruel and unusual punishment (US Const 8th Amend; NY Const, art I, § 5). The court, therefore, imposed an indeterminate sentence of eight years to life imprisonment. A divided Appellate Division affirmed (190 AD2d 162), the dissenters voting to reverse the sentence and remand the case to Supreme Court for resentencing in compliance with the Penal Law's mandatory sentencing provisions for an A-I felony conviction. A Justice of the Appellate Division granted the People's application for leave to appeal, and we now reverse.
In People v Broadie (37 N.Y.2d 100, cert denied 423 US 950), this Court in an opinion by Chief Judge Breitel, albeit not without doubts expressed regarding the wisdom of the severity of the sentencing scheme for drug offenses enacted in 1973 (L 1973, chs 276-278), upheld the facial and as applied validity of the mandatory maximum life imprisonment sentence and various mandatory minimum prison sentences in that legislation as against challenges under the cruel and unusual punishment prohibitions of the State and Federal Constitutions. In Broadie, this Court adopted the principle that a sentence may constitute cruel and unusual punishment by being "`cruelly' excessive, that is, grossly disproportionate to the crime for which [it is] exacted" (37 NY2d, at 125 [citations omitted]; see also, id., at 111). A majority of the Justices of the United States Supreme Court, in Harmelin v Michigan (501 US 957), reaffirmed the same principle, that gross disproportionality of a sentence of imprisonment violates the Eighth Amendment's Cruel and Unusual Punishments Clause (id., 501 US, at 997-998 [Kennedy, J., concurring with O'Connor *480 and Souter, JJ.]; id., 501 US, at 1013-1016 [White, J., dissenting with Blackmun and Stevens, JJ.]; see also, Solem v Helm, 463 US 277, 289-290; Weems v United States, 217 US 349, 377).
In assessing the proportionality of the mandatory sentences in People v Broadie, our analysis focused on the following factors: (1) the gravity of the offense, primarily in terms of the harm it causes society, but also in comparison with punishments imposed for other crimes in this State as well as with punishments for the same or similar crimes in other jurisdictions (supra, at 112, 115); and (2) "the character of the offender and the gravity of the threat he [or she] poses to society" (id., at 113; see also, Solem v Helm, 463 US, at 290-293, supra).
In People v Broadie, we found that "[m]easured thus by the harm it inflicts upon the addict, and, through him, upon society as a whole, drug dealing in its present epidemic proportions is a grave offense of high rank" (supra, at 113 [emphasis supplied]). Although the statutory sentencing scheme at the time equated the punishment level for drug dealing with that for the most heinous crimes of violence defined in the Penal Law, this Court found such severity not to be unreasonable because "drug-related crimes may be much more prevalent, that is, have a higher and rising incidence, than other crimes comparably punished or equally grave crimes not as severely punished, requiring greater isolation and deterrence" (id., at 116).
Turning in our constitutional analysis to the character of the eight defendants whose sentences were reviewed in People v Broadie, the Court recognized that, although not all of the defendants were "hardened" criminals, each was convicted of at least "street" sales or possession of large amounts of narcotics and none was what might be described as merely an "accidental" offender; therefore, we concluded that each could reasonably be considered a serious threat to society meriting severe punishment (id., at 113-114, 117). Accordingly, in Broadie, we found none of the sentences was grossly disproportionate to the crime committed, and concluded that the mandatory imprisonment provisions for drug-related crimes withstood both the facial and as applied challenges to their constitutionality. We nonetheless cautioned that, in the future, the mandatory drug sentencing laws might present "some rare *481 case on its particular facts [where it could] be found that the statutes have been unconstitutionally applied" (id., at 119).
In People v Jones (39 N.Y.2d 694), this Court was again called upon to determine whether the imposition of the mandatory maximum sentence of life imprisonment for a drug-related offense violated the constitutional prohibitions against cruel and unusual punishments. The defendant, a "millhand" in a large-scale heroin packaging and distribution operation, was arrested in a January 1970 raid and charged with joint possession (with 14 others) of over four pounds of heroin seized in the raid. She was offered (as were the other millhands) an opportunity to plead guilty to a lesser offense with a one-to-three-year sentence. She declined the offer and was found guilty after trial. A majority of this Court ruled that the mandatory sentence she received did not constitute cruel and unusual punishment. In so ruling, the majority rejected the dissent's conclusion that the marked discrepancy between her sentence and the sentence meted out to the other millhands, who had accepted the prosecution's plea proposal, constituted cruel and unusual punishment because it presented such a gross violation of the principle of equality of treatment for equally culpable offenders and had the effect of penalizing the defendant for exercising her right to a trial.
We last measured mandatory sentences for drug selling and possession against the constitutional proscriptions of cruel and unusual punishments in People v Donovan (59 N.Y.2d 834, affg 89 AD2d 968). As disclosed in the dissenting memorandum of Presiding Justice Milton Mollen at the Appellate Division (89 AD2d, at 968-971, supra), the defendant was convicted of first degree criminal sale and first degree criminal possession of a controlled substance, in connection with the sale of just under four ounces of cocaine by her boyfriend, a narcotics dealer, to an undercover officer. Defendant's involvement in the transaction was in procuring the drugs, apparently without personal profit, at her boyfriend's behest (the presentence report stated that the offense was "out of character" for her). She rejected an offer of a one-to-three-year sentence in exchange for a plea to a lesser offense. Her conviction after trial resulted in the imposition of the minimum mandatory sentence, 15 years to life imprisonment, while her boyfriend, the principal actor in the transaction, received a sentence of lifetime probation for subsequently cooperating with the authorities. We again rejected the defendant's cruel and unusual punishment claim (People v Donovan, 59 NY2d, at 836, supra).
*482 Considered in light of the analysis developed in our own and Supreme Court precedents, we must conclude that the constitutional prohibitions against cruel and unusual punishments were not transgressed on the record and facts of this case. Manifestly, the Legislature may constitutionally define criminal punishments without giving the courts any sentencing discretion (Chapman v United States, 500 US 453, 466-467). Even the most severe mandatory sentences may be fixed for sale or even possession of quantities of cocaine so large as to support the inference that they were held for purposes of sale, because of the pernicious effect of drug trafficking on society (Harmelin v Michigan, 501 US 957, 1001-1003, supra). Thus, in Harmelin, the majority of the Supreme Court upheld a mandatory sentence of life imprisonment without parole for possession of over 650 grams of cocaine. Indeed, the most salient factor cited by the dissenting Justices in voting to overturn the mandated sentence was the absence of any possibility of parole for the lifetime of the offender, a result the dissenters found only permissible if the conduct was "so atrocious that society's interest in deterrence and retribution wholly outweighs" all other penological considerations of individualized treatment in every case (id., 501 US, at 1028 [Stevens, J., dissenting]; see, 501 US, at 1022-1023 [White, J., dissenting]). By contrast, the sentence mandated here would authorize parole after service of the minimum term of imprisonment.
Considering the first element of the Broadie cruel and unusual punishments analysis, time has not eroded this Court's conclusion in Broadie that the selling of narcotic drugs represents a grave offense of the first magnitude. Neither has it altered our conclusion on the second element, that, in comparison to the sanctions for other crimes under our Penal Law and for the same or similar drug offenses in other jurisdictions, the mandatory sentences for drug offenses are "relatively severe, but not irrationally so, given the epidemic dimensions of the problem" (People v Broadie, 37 N.Y.2d 100, 117, supra).
To complete our analysis to determine whether defendant established the gross disproportionality of her punishment, we examine the extent of her culpability in this cocaine sale and the threat she poses to society (see, id., at 113; Solem v Helm, 463 US 277, 293, supra). The undisputed evidence in this regard is not overly favorable to defendant. The undercover *483 officer testified at the trial without contradiction that defendant made a direct sale to him, filling his order for 200 vials of cocaine for a price of $2,000 and then knowledgeably haggled with him over the amount of the customary bonus of additional vials, insisting on giving him only 14 over his claim of entitlement to 20 extra vials, but promising to "take care of" him personally "the next time" he came. Her conduct hardly bore the earmark of an "accidental" offender (People v Broadie, supra, at 113). As the Trial Judge noted at sentencing, defendant "understood fully well what she was involved in". It is noteworthy in this respect that in Broadie, Chief Judge Breitel expressly held that "[n]one of the present cases involve what are often called `accidental' offenders * * * [because each of the eight defendants] was convicted of at least `street' sales of heroin or cocaine, or possession of a large amount of narcotics" (id., at 113). Undeniably here, the sale of 214 vials of cocaine for $2,000 was, at the very least, at one higher level of culpability (and risk to society) than the street sales in Broadie. Moreover, defendant's election to personally sell a requested significant quantity of drugs at the wholesale level is to be completely contrasted with the conduct of the defendant in People v Jones (39 N.Y.2d 694, supra). In Jones, the defendant was a "millhand" at the very lowest level of the heirarchy of the illegal drug enterprise, packaging the drugs. She was convicted of joint constructive possession of the four pounds of heroin found by the police at the premises during the raid. As a minor functionary in the enterprise, obviously the defendant in Jones had no actual control over the quantity of drugs that happened to be on the premises at any one time and, in that sense, Chief Judge Breitel in dissent could well characterize her as "perhaps an accidental" (id., at 701) offender as to the commission of a level of criminal possession of a dangerous drug dependent upon the quantity of the drugs possessed. In this case, despite the Trial Judge's expressed certainty, based upon the evidence at trial, that defendant was in fact guilty as charged, defendant never accepted any personal responsibility for her criminal behavior nor expressed any remorse.
Moreover, we find no record support in the trial transcript or the presentence report of even a claim by defendant, much less evidence, that defendant's criminal involvement was due to the domination of or coercion by her uncle, the principal in the drug operation in which defendant's sale took place. Indeed, it was the conclusion of the probation officer who *484 performed the presentence investigation that defendant's involvement in the offense was motivated by a desire "to obtain personal profit". That conclusion was derived in part from the officer's interview with defendant, which was a good "vantage point to draw inferences, characterizations and interpretations from the record" (dissenting opn, at 491), particularly since defendant did not testify at the trial.
Nor does the punishment her uncle received establish gross disproportionality. He was indicted, inter alia, for five criminal sales of a controlled substance in the first degree, and pleaded guilty to one such sale in a plea bargain under which he was sentenced to 15 years to life imprisonment. While undoubtedly his far greater culpability merited substantially more punishment than defendant received, the comparative leniency in treatment of defendant's uncle is significantly less than that objected to in People v Jones (supra) and People v Donovan (supra). And, even in those cases, the disparity in punishment was not sufficient to establish gross disproportionality.
Although defendant's presentence report discloses mitigating factors in her family history, they do not demonstrate such an exceptional level of childhood deprivation that would significantly excuse her behavior. Defendant informed the probation officer who conducted the presentence investigation that "she received adequate supervision and that the quality of the home was decent" during most of her formative years when she was raised by a grandmother in Jamaica, British West Indies.
All of the foregoing factors militate against finding that defendant is the rare case we envisaged in Broadie that, on its particular facts, would present an exception to the general facial constitutionality of the Penal Law's mandatory sentencing provisions for drug-related offenses. Indeed, based on our assessment of the gravity of the offense she committed and her personal culpability, we could only find defendant's mandated sentence cruel and unusual punishment by concluding that the constitutional prohibitions prevented mandatory imprisonment for all offenders of defendant's age. Yet the Legislature has consciously extended the A-I felony mandatory minimums to youths in defendant's age category (see, CPL 720.10 [2] [a]; see also, CPL 220.10 [5]; Schwartz, Preface to Chart V, NY Sentencing Charts 1994 Edition, Pamphlet to McKinney's Cons Laws of NY, Book 39, Penal Law, at 18-19). *485 The prevalence of the employment of adolescents to market illegal drugs is now well recognized (see, Letwin, Report From the Front Line: The Bennett Plan, Street-Level Drug Enforcement in New York City and the Legalization Debate, 18 Hofstra L Rev 795, 813 [1990] [see, sources cited therein]). Thus, the Legislature could rationally determine that teenage drug dealers pose a serious threat to society. Clearly, defendant has not met her burden of showing any objective basis for us to conclude that contemporary standards of decency prevent imposing a sentence of 15 years to life imprisonment upon an older adolescent for a direct volitional sale of more than two ounces of cocaine for $2,000 (see, Stanford v Kentucky, 492 US 361, 380-382 [O'Connor, J., concurring], 383-384 [Brennan, J., dissenting]; Trop v Dulles, 356 US 86, 100-101; see also, Hutto v Davis, 454 US 370; Terrebonne v Butler, 848 F.2d 500, cert denied 489 US 1020).
Before concluding this opinion, it is appropriate to address the principal arguments of the dissent urging affirmance. The dissent takes us to task for failing to set forth cruel and unusual punishments criteria for the guidance of sentencing and intermediate appellate courts, and for "overturning the opposite views of both prior courts, effectively render[ing] a first instance judgment that an Eighth Amendment transgression and the Broadie rare case exception are not present." (Dissenting opn, at 495.)
In reviewing the as applied constitutionality of the sentencing statute in this case, we considered the gravity of defendant's crime, that is, the harm it causes society and its comparative seriousness in light of the punishments for other State crimes and for the same offense in other jurisdictions, as well as in comparison to the punishment of the other charged participant. We also reviewed defendant's personal history and her role in the commission of this criminal offense, and found no strongly mitigating factors, other than her youth, which we determined was alone insufficient to establish gross disproportionality for constitutional purposes.
The foregoing factors were essentially those set forth by Chief Judge Breitel in People v Broadie (37 N.Y.2d 100, 113, supra). They were also the same factors applied in Solem v Helm (463 US 277, 290-293, supra), the most recent case in which the Supreme Court struck down a mandatory sentencing law. And they were the factors applied in the proportionality analysis of the dissenters in Harmelin v Michigan (501 US 957, 1018-1027, supra *486 [White, J., dissenting]), the most recent case in which the Supreme Court reviewed (and then upheld) a mandatory sentencing scheme.
The Broadie-Solem analysis is designed to furnish an objective, principled basis for review of sentencing claimed to violate the cruel and unusual punishments clauses (see, Harmelin v Michigan, 501 US, at 1018-1021, supra [White, J., dissenting]). For the same reason, in Broadie, Chief Judge Breitel adopted that analysis in place of "a subjective evaluation which looks to the extent to which the conscience of the court is shocked by punishments imposed" (37 NY2d, at 111, supra [emphasis supplied]).
The Broadie-Solem criteria pay due deference to the preeminent role of the Legislature in choosing penological objectives. In Broadie, despite expressing policy misgivings, Chief Judge Breitel acknowledged that the Legislature could validly adopt deterrence  through wide severity of punishment  as the supervening objective in fashioning a statutory framework for drug crime control:
"Thus, to achieve the deterrence, so far seemingly elusive, the would-be drug trafficker had to be put on notice that, should he be caught, his fate was sealed regardless of his position in the heirarchy of distribution and regardless of the quantity of drugs in which he dealt" (id., at 115).
The dissent's suggested alternative mode of cruel and unusual punishments review dispenses with comparative proportionality analysis as a principal means of insuring objectivity in deciding the constitutionality of sentences and restricting discretionary adjudication in this area. The dissent appears to limit the role of comparative proportionality assessment to determining "whether a sentence less than the most severe mandatory variety would deprecate the seriousness of the particular crime in general, in relation to other participants charged and uncharged, and in relation to other serious crimes of equal classification rank." (Dissenting opn, at 497.) Apart from this nod to objective standards, the dissent's approach would have the trial court in each case consider and weigh a lengthy list of particularized factors in a "nuanced" manner (dissenting opn, at 499) typically exercised by sentencing courts under individualized, indeterminate statutory sentencing regimes.
Undoubtedly, the dissent's approach would enlarge the discretion *487 of trial courts to determine that a mandated sentence in a given case was cruel and unusual punishment, based upon the sentencing court's findings on the various particularized factors and its weighing of those factors. The dissent's awareness of this likely effect is demonstrated in the candid statement that the suggested approach "focuses on the distribution of the power of sentencing adjudication" (dissenting opn, at 499). It, thus, impliedly rejects the proposition that indeterminate sentencing is not a constitutional imperative (see, Chapman v United States, 500 US 453, supra).
The weakening effect on the presumption of constitutionality of the dissent's heavily discretionary system of determining challenges to the as applied constitutionality of the drug offense sentencing scheme will be far greater than is envisaged in the dissenting opinion. Inevitably, a system emphasizing the sentencing court's findings and weighing of distinctive factors would lessen this Court's role as the final, paramount arbiter of State constitutional issues. The dissenters' readily understandable antipathy to the so-called "Rockefeller Drug Laws" should not becloud recognition that adoption of their proposed method of review would drastically change the role of this Court on challenges to the as applied constitutionality of legislation in general and even more radically alter the sound, principled cruel and unusual punishments jurisprudence which this Court has heretofore developed.
That is not to say that we disagree with the strongly held convictions of our dissenting colleagues and of the majority at the Appellate Division in the instant case (190 AD2d, at 166-167, supra) that the harsh mandatory treatment of drug offenders embodied in the 1973 legislation has failed to deter drug trafficking or control the epidemic of drug abuse in society, and has resulted in the incarceration of many offenders whose crimes arose out of their own addiction and for whom the cost of imprisonment would have been better spent on treatment and rehabilitation. The experience of the last two decades has clearly vindicated the doubts Chief Judge Breitel expressed in People v Broadie on the wisdom of the draconian drug sentencing laws. Nonetheless, even if the legislative choice was unwise, the central holding of Broadie still stands, namely, that the Legislature was not irrational in its view of the gravity of the offenses, the danger posed by the offenders and the penological purposes to be served and, therefore, the punishment imposed for defendant's crime here *488 "in the present state of [our] knowledge [was] not grossly disproportionate or cruel and unusual in the constitutional sense" (People v Broadie, supra, at 118-119). Reform of the penological policy choices in combatting the drug scourge lies with the legislative, not the judicial, branch (see, Rummel v Estelle, 445 US 263, 283-284; id., at 282-284, nn 27-29; People v Broadie, supra, at 117 ["That courts may believe that the Legislature is mistaken, does not lessen the legislative power"]).
Accordingly, the order of the Appellate Division should be reversed, and the matter remitted to Supreme Court, New York County, for resentencing in accordance with this opinion.
BELLACOSA, J. (dissenting).
Judge Ciparick and I respectfully dissent and vote to affirm the order of the Appellate Division which upheld the sentence imposed on defendant by the trial court. By reversing the sentence, the Court of Appeals today compels the resentence of defendant to a mandatory minimum of 15 years to life imprisonment. The Court rules that this more severe sentence is required to effectuate the will of the Legislature, expressed more than 20 years ago as part of the frustratingly decried, yet intractably operative, Rockefeller Drug Sentencing Laws.
We agree with the courts below that this new fate visited upon Angela Thompson  a near doubling of her minimum sentence from 8 years to 15 years  is not jurisprudentially required. Indeed, when this Court facially upheld the constitutionality of this draconian sentencing scheme, it expressed the qualification that wise adjudication on an as-applied basis should deal with cases that crossed the line of cruel and unusual punishment, denominated generically at that time as rare exceptions (see, People v Broadie [and seven other discrete cases], 37 N.Y.2d 100, 119, cert denied 423 US 950; see also, People v Jones, 39 N.Y.2d 694, 698 [Breitel, Ch. J., dissenting]; US Const 8th Amend; NY Const, art I, § 5).
The only issue before the Court, on the People's appeal in this case, is whether sentencing this woman to less than the mandatory term of 15 years to life imprisonment is warranted. We conclude that the circumstances of this case support the prior courts' rulings that the lesser period of incarceration is warranted because the mandatory sentence inflicts a grossly disproportionate penalty on defendant. This case falls within Broadie's "rare case" exception, examined, *489 understood and applied in the brighter light of contemporary standards, based on 20 years of experience and empirical data (see, Appendix). Our conclusion in no way condones or minimizes the volitional, personal responsibility of defendant for serious criminal conduct which, upon conviction, brought her, by the judgment of the sentencing court, a minimum of eight years actual imprisonment.

I.
Each side in this case has argued vigorously and has added gloss, characterizations and inferences with respect to the facts. The essential and controlling features of this case, however, are essentially uncontroverted. Angela Thompson, a 17-year-old woman, was arrested in 1988 after making a single sale of cocaine to an undercover police officer at her uncle's residence.
The presentence report shows that defendant grew up in a variety of places and under several different custodial arrangements. Her uncle, Norman Little, was running a major drug-selling operation in Harlem, and at some point he employed her in his illicit enterprise. Eventually, the uncle turned out to be Angela Thompson's codefendant, though the police acknowledged that he was the principal target of their investigation and prosecution. In an effort to arrest the uncle and shut down this major drug operation, the police made four separate undercover drug purchases on four different days. Defendant had made one sale to an undercover officer of 214 vials of crack cocaine with a street value of $2,000. During the course of the sale, defendant's uncle entered the room and stood between defendant and the undercover police officer for a short time. The weight was 2.13 grams over the two-ounce (56 grams) limit to qualify as a class A-I felony sale. A grain, which is the smallest unit in the system of weights used in the United States, weighs .0648 of a gram. The additional 33 grains in this case weighed 2.13 grams, which is less than one tenth of an ounce.
Following her arrest, defendant was charged with an A-I felony. The People offered her a plea bargain carrying a sentence of three years to life and, just before trial, four years to life, but she rejected both offers. She was on $1,000 bail until the trial and showed up for every court date. Having put the People to their proof at trial, she was convicted of the A-I felony.
*490 Justice Bing Newton, the Trial Justice, heard all the evidence and saw all the necessary participants. She sentenced defendant to eight years to life and trenchantly commented:
"Notwithstanding the Legislative desire to create mandatory minimum sentencing guidelines for the State of New York, I think it's still the law of this country that the punishment must fit the crime. * * * The question is whether or not the defendant is the type of person, by the facts presented in this case, such that, Constitutionally, this would be inappropriate, to serve 15 years to life. I know the defendant committed this crime when she was 17 years of age. * * * I will note that while defendant was found in the location at the time the search warrant was executed, that this indicates a single transgression of the law. * * * Her uncle, Norman Little, obviously is the person who put her in this position. * * * The problem with these [Broadie] guidelines are that they are not compelling and clear. So, the Court does not have a lot of guidance. * * * I conclude that the defendant, to be sentenced to 15 years to life, would be getting an unconstitutional sentence. * * * I make this determination * * * applying the Constitutional standards that are outlined in [Broadie] to this case, and therefore, [I] leav[e] it to the Appellate Court to * * * give guidance as to when it is appropriate to apply the [Broadie] case" (People v Thompson, Sup Ct, NY County, Dec. 11, 1989, Bing Newton, J., indictment No. 03994-89, Sentencing Minutes [emphasis added]).
On her appeal to the Appellate Division, defendant encountered the People's cross appeal claiming that her sentence was illegal and too low on the minimum side. The prosecution's strategy, however legally unassailable, is entitled to be viewed somewhat skeptically in view of the context of the lesser pretrial offers, the sentence it consented to for the uncle, and the initial failure to appeal the "illegality" of the sentence until defendant pursued her judgment appeal rights. Indeed, the prosecutor in oral argument of this case before this Court, with no basis in the record, declared that there is a "small group of judges applying their own black-robed predilections on this issue," including, apparently, the Trial Justice and Associate Justices constituting the majority at the Appellate *491 Division in this case. This disrespectful characterization should be rejected categorically because all the Justices and Judges in this case, and presumptively in all others, act out of a conscientious oath-driven duty to render justice ideally and in the given case to all sides equally.
The Appellate Division, in any event, rejected the People's effort to ratchet defendant's sentence up to 15 years to life, though it also ruled against her on her appeal. Justice Asch, for the Appellate Division majority, interpreted the record and arguments, adding this comment with respect to the sentence on this defendant, by then 22 years of age:
"A system of justice which mandates a 15-year prison sentence, as a minimum, on a 17-year-old girl, who was not cared for by parents and under the domination of her uncle * * * also mandates a lifetime of crime and imposes on the community, upon her release, a woman who may be incapable of anything but criminal activity. If we do not attempt to rehabilitate such young people, we condemn ourselves as well" (190 AD2d 162, 167 [Asch, J.] [emphasis added]).
The prior courts rightly considered Angela Thompson's character and personal circumstances. We are convinced that they had the best vantage point to draw inferences, characterizations and interpretations from the record, a rather ordinary and traditional deference in such matters.
Notably, defendant's uncle was arrested on 12 counts, including four separate sales on different dates. The People consented to his plea of guilty to one count of criminal sale of controlled substance in the first degree, with a sentence of 15 years to life. Defendant Thompson and at least one other similarly situated young woman (against whom charges were dismissed) were only coincidentally present at the time of the execution of the search warrant and caught in the net spread to catch Norman Little. Defendant's conviction constitutes her entire criminal record and no other criminal activity appears in her presentence report data. On the other hand, despite his three prior felony and seven prior misdemeanor convictions, the uncle received the identical sentence now superimposed on Angela Thompson. These juxtaposed sentences are substantively and analytically no different from the kind of disproportionate sentencing condemned by former Chief Judge Breitel in his passionate dissenting opinion in People v Jones (39 N.Y.2d 694, 698, supra *492 [four pounds of heroin]; see, Brennan, Reason, Passion, and "The Progress of the Law" [Cardozo Memorial Lecture, delivered before the Association of the Bar of the City of New York], 10 Cardozo L Rev 3, 12 [1988]). Indeed, defense counsel argued, without contradiction, another aspect of disproportionality at the sentencing of Angela Thompson:
"There was also, during this arrest, the arrest of a third female, who could have been charged with an A-I felony, a young lady, I believe similar in age to the defendant. She had made or assisted in the sale, A-I weight, to Officer Dante Grey. And during the hearings it came out, I believe, her nickname was Shorty. But, my memory could be wrong, that the District Attorney's Office decided not to prosecute her because they were afraid at that time that if they had arrested her, Mr. Little would know who the undercover officer was at that time, and this was early on in the proceedings. Now, granted, that's a very legitimate concern, and I fully understand why the People would make that type of decision, to protect their undercover, which is, of course, a concern to everybody. But it shows how another young individual, just like Miss Thompson, doing the exact same act, because of discretion decisions by the District Attorney's Office, is not standing here today, before the Court, facing these consequences. That she's not being sentenced, she hasn't even been charged. It's alleged she did the same thing that Miss Thompson did on one occasion. The undercover testified, I believe, truthfully at trial. He never saw Angela Thompson on any other date during this investigation, before arrests were made, other than that one date that the sale was made. This was over a six week period of time, he's back and forth to that location. It shows the type of involvement Miss Thompson had, if we accept the jury's verdict, which, of course, Miss Thompson does not, but I have to face as her attorney. That type of disparity where individuals are not prosecuted for legitimate reasons, and because of the fear it might have that they might give information to someone else who has been arrested, and the type *493 of disparity where Mr. Little receives the same sentence that this defendant faces today, although he chose to plead guilty and she chose to go to trial, maintaining her innocence, shows why this particular case is not a case where 15 to life should be given to the defendant." (People v Thompson, Sup Ct, NY County, Dec. 11, 1989, Bing Newton, J., indictment No. 03994-89, Sentencing Minutes.)
The final outcome of this case requires no characterization, as it speaks starkly for itself. Angela Thompson must now be informed, five years after the original sentence and after having served nearly two thirds of her original minimum sentence, that a new fateful day of reckoning has arrived, as the Court of Appeals today effectuates the near doubling of her minimum sentence.

II.
The mandatory minimum sentence of 15 years with the prospect of incarceration for life represents one of the most severe penalties prescribed under New York State law. It reflects society's and the Legislature's high level of condemnation for the most reprehensible crimes and the most serious offenders, e.g., murder in the first and second degrees (Penal Law §§ 125.27, 125.25), kidnapping in the first degree (Penal Law § 135.25), and arson in the first degree (Penal Law § 150.20).
As noted, Angela Thompson's sale was slightly over the required two-ounce weight to qualify as an A-I crime (compare, People v Ryan, 82 N.Y.2d 497 [932.8 grams of mushrooms containing approximately 5,303 milligrams of controlled substance psilocybin]). The weight in this case was bumped up to A-I level by specific importuning from the undercover buyer-officer. The additional one tenth of an ounce, by the ruling of this Court today, thus adds up to seven more minimum years of imprisonment beyond that prescribed by the trial-sentencing Justice. Indeed, had those 2.13 grams not been tacked on, defendant would have been accountable for an A-II sale, whose mandatory minimum sentence is only three years (Penal Law § 70.00 [3] [a] [ii]).
By tendering this dissenting view, we intend no disrespect for the Legislature's prerogatives in prescribing the types of criminal conduct and allocating appropriate punishment levels. *494 This Court has acknowledged, after all, the Legislature's power to severely limit the discretion that courts may exercise in sentencing decisions (see, People v Broadie, 37 NY2d, at 123, supra; Penal Law § 70.00). Correspondingly, however, respect must be accorded the principle that "the Constitution of this state confers power upon the courts to declare void legislative acts prescribing punishments for crime, in fact cruel and unusual" (People ex rel. Kemmler v Durston, 119 N.Y. 569, 577 [the first electrocution death sentence held not cruel and unusual because it was "immediate" and "painless", two propositions that are surely debatable in the wake of slightly over 100 years of experience and empirical data about electrocutions], affd sub nom. In re Kemmler, 136 US 436; People v Broadie, supra, at 119; see, NY Const, art I, § 5). While courts will grant appropriate deference to the Legislature regarding its presumptively constitutional sentencing promulgations, and to the Executive in the person and office of local prosecutors for implementing those sentences, no penalty should be entirely off limits to appropriate judicial responsibility. Rather, courts are obliged to scrutinize the sentences that they impose or review against applicable constitutional principles.
Historical analysis reveals that the constitutional prohibition against cruel and unusual punishment found under the State Constitution was primarily directed at sadistic and purely degrading cruelty, including all forms of torture, barbarity or inhumane treatment (see, People v Broadie, 37 NY2d, at 124, supra; Mulligan, Cruel and Unusual Punishments: The Proportionality Rule, 47 Fordham L Rev 639, 640-645 [1979]; see also, Matter of Bayard, 25 Hun 546, 549; Ordinance of 1638, in O'Callaghan, Laws and Ordinances of New Netherland, 1638-1674, at 10, 12 [crimes should be punished "according to the circumstance of the case"]). Courts as far back as colonial New York considered on sentencing the "baseness of the offense, the behavior and the age and standing of the defendant" (see, Goebel and Naughton, Law Enforcement in Colonial New York, at 682, 702). Moreover, the evolving nature of the protection against cruel and inhuman punishment under the United States and New York State Constitutions includes examination of proportionality under contemporary standards (see, e.g., Harmelin v Michigan, 501 US 957 [650 grams of cocaine]; Solem v Helm, 463 US 277; Robinson v California, 370 US 660; Weems v United States, 217 US 349; People v Broadie, 37 N.Y.2d 100, supra; People v Davis, 33 N.Y.2d 221, cert denied 416 US 973; *495 Berger, Justice Brennan vs. The Constitution, 29 BC L Rev 787, 787, n 4 [1988] [citing Address by Justice Brennan, Georgetown University, Washington, D.C., printed in The Great Debate: Interpreting Our Written Constitution, at 11 (Federalist Society 1986)]).
This is the first case since deciding People v Broadie (37 N.Y.2d 100, supra) in which this Court, instead of leaving undisturbed the sentences below, substitutes the more severe, legislatively mandated minimum sentence in lieu of the sentence imposed by the prior courts in their effort to arrive at a constitutional, proportioned and appropriate sentence (see, People v McCleese, 71 N.Y.2d 839; People v Ortiz, 64 N.Y.2d 997; People v Donovan, 59 N.Y.2d 834, affg 89 AD2d 968; People v Jones, 39 N.Y.2d 694, supra; compare and contrast, People v Martinez, 191 AD2d 306 [sentence of 4½ to 9 years for criminal sale of a controlled substance in the third degree reduced to 2 to 4 years]; People v Skeffery, 188 AD2d 438 [mandatory sentence of 15 years to life for criminal possession of a controlled substance in the first degree reduced to 5 years to life]; People v Andrews, 176 AD2d 530, lv denied 79 N.Y.2d 918 [mandatory minimum sentence of 15 years to life for A-I drug felony reduced to five years to life to avoid being "cruel and unusual"]; People v Ramirez, NYLJ, Oct. 1, 1993, at 22, col 3 [17-year-old defendant given sentence of probation following conviction of criminal sale of controlled substance in the second degree]; People v Royster, 117 Misc 2d 112 [defendant sentenced to five years probation after pleading guilty to one count of criminal sale of a controlled substance in the third degree]).
In the instant case, the Court, by overturning the opposite views of both prior courts, effectively renders a first instance judgment that an Eighth Amendment transgression and the Broadie rare case exception are not present. The reversal of a lesser sentence binds defendant to the legislative yoke of the Rockefeller drug "solution" of the 70's. In practical terms, it allows, ironically, no judicial sentencing discretion or departure from absolute mandates in the particular framework of this case and especially in the face of some enlightenment in the 90's concerning the penological consequences of wholesale mandatory sentencings.
This area of the law also still lacks sufficient criteria by which the parties, the Bench and the Bar would be guided in *496 how or when to appropriately request or invoke this court-decreed protection. The trial court expressed on the record the particular difficulty of sentencing under Broadie's continued lack of specificity. If any realistic value is to be salvaged from the otherwise illusory promise of Broadie, that guidance should be forthcoming so as to justify the decision in this case and to test future ones.
In suggesting some factors as a start for the Court to build and articulate a useful and quite appropriate test in a real case setting, we by no means intend that any one or all of these factors should be determinative in a given case. While the Court cannot substitute its role for that of the Legislature and declare a comprehensive code, the Judiciary, in our respectful view, should provide some texture, context and substance beyond an exhortation that rare cases may result in departures from the mandatory sentences.
Some years ago, faced with a similar vacuum of legislative criteria for the exercise of the interests of justice dismissal power, the Judiciary filled the interstice (People v Clayton, 41 AD2d 204 [Hopkins, J.]). Spurred by that traditional common-law development (see also, People v Belge, 41 N.Y.2d 60, 62), the Legislature eventually codified criteria for nisi prius guidance and appellate review purposes (CPL 210.40). Broadie's atrophying rare case exception has apparently stimulated particular legislative attention in a bill that, arguably and as finally enacted, might allow an interests-of-justice consideration of a reduction in just such a case as the instant one (see, 1994 NY Assembly Bill A 7693). Angela Thompson's sentence, if this bill were law, could be only 1 to 3 years. While legislative reform may be on the horizon, however, the courts cannot escape the obligation to decide this case under prevailing, evolving principles which might, as with Clayton and Belge, rouse appropriate legislative action.
We propose for this case, for future cases and until remedial legislation is a reality, that the analysis of a sentencing and appellate reviewing court under the rare case exception may include (1) objective criteria including, but not limited to: (i) the gravity and nature of the offense, (ii) the relative culpability of the defendant, (iii) the proportionality with other similarly situated or differentiated defendants; and (2) subjective criteria involving the history of the particular defendant. Trial courts can be counted on to competently and responsibly apply and particularize the factors and balance the enumerated objective and subjective criteria.
*497 Interestingly, comparable assessments are duly entrusted for lesser liberty matters under narrow, judicially created review standards for administrative agency disciplinary determinations (see, Matter of Pell v Board of Educ., 34 N.Y.2d 222). If a penalty "shocks the judicial conscience" in that field of law, Judges strike it down. In this different but parallel field, where the most serious liberty interests are at stake, this cruel and unusual mandatory sentence shocked the conscience of the Trial Justice, the Appellate Division, and it shocks at least two Judges at this final level of review. We respect the fact that reasonable minds might disagree on the application of available criteria, and that we and other courts could conclude differently as to whether a particular defendant and case qualifies as a rare case exception. As-applied constitutional adjudication does not, however, justify the failure to articulate and apply contemporary sentencing guidelines which would make our respective and respectable differences on application in this case more understandable.
More specifically, the pertinent factors should include any exceptional special circumstances inhering in the nature of the criminal transaction itself. Since the gravity of drug crimes is keyed to the weight of the drugs sold or possessed, the amount of the drugs in weight and dollars should be part of the exceptional sentencing appraisal. Selling pounds of an illegal drug with a value of hundreds of thousands or even millions of dollars should not be per se homogenized with relatively and significantly smaller transactions of a few hundred or thousands of dollars. Scale is key and is relevant to the proportionality analysis. There could also be an assessment of the conduct and actions of the law enforcement personnel from the time of the commission of the crime, if they are involved, through the prosecution phases. Consideration should, of course, be given to the number or length of times that a defendant participated in criminal activity and whether a sentence less than the most severe mandatory variety would deprecate the seriousness of the particular crime in general, in relation to other participants charged and uncharged, and in relation to other serious crimes of equal classification rank.
Next, a defendant's relative pecking order, as subservient or dependent, contrasted to those with relatively higher and especially, as here, the highest hierarchical power and control, is pertinent. The degree of sophistication generally and with *498 respect to the particular criminality, as well as the precipitating agent or cause of the crime, have some bearing on appropriate and proportionate sentencing. An employee-serf-like defendant who has no entrepreneurial role and financial stake, should not be treated at the same level as the kingpins and bosses (People v Jones, 39 N.Y.2d 694, 698, supra [Breitel, Ch. J., dissenting]).
We emphasize that our view does not create or promote a per se drug millhand or courier rare case exception, nor does youth or any particular age alone justify the invocation of the rare case exception. While those features are appropriate to the over-all particular analysis, they do not constitute their own artificial, automatic entitlement to departure from the prescribed mandatory minimum.
In assessing proportionality of the punishment, traditional sentencing concepts such as the character of a defendant, personal history and special circumstances are indispensable. This facet would include the age, school record, employment history and family circumstances. This review is limited to presentencing activities. Any personal or family history, or rehabilitation following sentencing while in prison, cannot be considered on our constitutional inquiry on the direct appeal relating to the judgment of conviction but is reserved for collateral judicial review, correctional department considerations and even clemency applications (see, People's motion to strike portions of respondent's brief and Appendix, granted simultaneously with this decision on the People's appeal). Included, too, would be consideration of the proportionality of the sentence between persons more seriously involved in the same offense, like the uncle codefendant here, who received the same or lesser sentence as defendant and the other young woman who apparently was not charged at all. Empirical data and analysis may even be developed or discovered from official correctional records and reports to show that these kinds of mandatory sentences fall disproportionately and exploitively on young minority recruits including, as in this case, an African-American teenage woman (see, US Dept of Justice, Bureau of Justice Statistics, Sentencing in the Federal Courts: Does Race Matter? The Transition to Sentencing Guidelines, 1986-1990, at 10-14 [Executive Summary] [1993] [wide sentencing disparities based on race discovered in crack cocaine crime category]). Moreover, the wholesale enlistment of numerous youngsters into drug trafficking is not a reason for the Judiciary to preclude the use of the Broadie rare case exception. *499 Rather, it represents a greater urgency and responsibility to apply it responsibly and appropriately, even if some additional individuals would qualify for relatively more lenient, but also more proportionate, sentencing.
Not to be overlooked either is the fact that appellate review would be available under identifiable and measurable standards as we have suggested (see, People v Belge, 41 N.Y.2d 60, supra). In the highest judicial tradition, we urge nuanced exceptional sentence exertions justified by on-the-record explication, not some open-ended discretion. No one should forget that public officers in the other two branches of government are not inherently or presumptively wiser and more conscientious than judicial officers  or vice versa  and the other branches have not been invested with unilateral power over the liberty of individuals. To the contrary, the unique responsibility of sentencing is traditionally reposed in neutral Magistrates, not in partisan prosecutors. Ultimately, it is Judges who bear the singular, awesome duty of facing defendants in open court on the day of reckoning to declare the law's sentencing judgment.

III.
In sum, this case focuses on the distribution of the power of sentencing adjudication in a particular category and framework. It implicates and resolves who really exercises that momentous duty, under what circumstances, and with what respectful checks-and-balances.
We decided to dissent because we concluded the Judiciary has more power and responsibility than it is undertaking in this case and in this critical adjudicative area. The exception from the mandatory absolutes of the sentencing scheme was described generally in People v Broadie (37 N.Y.2d 100, supra [Breitel, Ch. J.]). While that aspect was a key ingredient to Broadie's holding, the originator of the idea ironically saw his equalizing qualification rejected when the Court first considered and ruled, 4 to 3, against invoking the reserved authority; it declined to declare a particular rare case exception in that drug factory millhand case (People v Jones, 39 N.Y.2d 694, 698, supra [Breitel, Ch. J., dissenting]). Today, the exhortation should be animated because it is buttressed by empirical data and a record that justifies resolute, differentiated sentencing (compare, People v Bing, 76 N.Y.2d 331, 338; see, Appendix). The Court should not be deterred by floodgate speculation. Real criteria and appellate review are sufficient guardians against runaway sentencing exercises generally and in individual cases.
*500 What was not cruel and unusual in 1789 (ratification of Constitution) or 1888 (decision in Kemmler case with his execution) may well be unconstitutional in 1994. Similarly, what was not rare in the subset of the cruel and unusual punishment concept in 1975 (Broadie) and 1976 (Jones) may be ripe for such classification today. We believe that constitutional adjudication is a dynamic, evolving process, not a static set of revered relics. The genius of Chief Judge Breitel's exception should be given life today, not be frozen in the time and meaning of 20 years ago (Brennan, The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights, 61 NYU L Rev 535, 544 [1986]; Berger, Justice Brennan vs. The Constitution, 29 BC L Rev 787, 787, n 4 [1988] [citing Address by Justice Brennan, Georgetown University, Washington, D.C., printed in The Great Debate: Interpreting Our Written Constitution, at 11 (Federalist Society 1986) ("[Constitutional i]nterpretation must account for the transformative purpose of the text")]).
Prosecutors, as Executive Branch officers, should not enjoy the power to shackle judicial responsibility while they zealously seek to incarcerate masses of criminal drug offenders (compare, People v Roe, 74 N.Y.2d 20, 29, 35 [Bellacosa, J., dissenting] ["Some very disproportionate miscarriages of justice  this case is one of them  will certainly ensue from this prosecutorial leverage in elevating reckless manslaughter to murder."]). A balanced judicial role, envisioned as necessary by Broadie and exercised by prudent Trial Judges whose sentences would remain subject to the leavening, harmonizing review by the Appellate Divisions on appeal by prosecutors, is necessary. The prior courts in this case made a wise, humane, fair, bold and correct sentencing ruling, justified by the record, by their findings and by a host of the factors we have proposed. We should sustain their effort, not overturn it and stifle future efforts.
We conclude that the hardly lenient sentence of eight minimum years to life originally imposed on Angela Thompson should be upheld by affirming the prior courts as heralds of the arrival of Broadie's promise that a rare case exception does indeed exist.
Order reversed, etc.

APPENDIX OF SELECTED STATISTICS AND USEFUL SOURCES
Some measurement of the impact of this mandatory sentencing scheme is illustrated by some statistics drawn from a mass of data and official reports.
 In 1982, 63% of New York State's correctional inmates were violent criminal offenders; by 1992, that percentage had shrunk to 34%. In 1973, the State's prison population was 12,444 (see, 1985 Determinate Sentencing Report and Recommendations, NY St Comm on Sentencing Guidelines, at 135).
 By 1982, the prison population had doubled to 25,499 (see, 1985 Determinate Sentencing Report and Recommendations, NY St Comm on Sentencing Guidelines, at 135) and, by 1991, the total prison population exceeded 60,000 inmates, a 480% increase in 20 years.
 State prison sentencing resulting from felony indictment arising from the sale or possession of narcotics increased from 2,865 in 1985 to 13,185 in 1991 (see, 1989 Crime and Justice Ann Report, Div of Criminal Justice Servs, at 250; 1991 Crime and Justice Ann Report, Div of Criminal Justice Servs, at 193).
 In 1989, State prison sentences resulting from drug indictments accounted for 46% of the prison sentences, compared to only 18% in 1985 (1989 Crime and Justice Ann Report, Div of Criminal Justice Servs, at 249).
 The percentage of offenders in the State prison system with a mandatory determinate sentence of five years or more increased from 37% in 1974 to over 52% in 1983 and is surely still climbing (see, 1985 Determinate Sentencing Report, op. cit., at 136).
 Following the implementation of the Federal Sentencing Reform Act of 1984 and the new mandatory minimum imprisonment provisions of the Anti-Drug Abuse Act of 1986, substantial aggregate differences in sentences imposed on White, Black and Hispanic offenders have been identified. During an 18-month study beginning in January 1989, on average, Black offenders sentenced to prison had imposed sentences that were *502 41% longer than Whites. This disparity is directly related to Congress's determination to treat the trafficking of crack and powdered cocaine differently. Eighty-three percent of all Federal offenders convicted of trafficking in crack cocaine were Black, and the average sentence imposed for crack trafficking was twice as long as for trafficking in powdered cocaine (see, US Dept of Justice, Bureau of Justice Statistics, Sentencing in the Federal Courts: Does Race Matter?, The Transition to Sentencing Guidelines, 1986-1990, at 1 [Summary] [1993]).

* * *
1985 Determinate Sentencing Report and Recommendations, NY St Comm on Sentencing Guidelines.
1989 Crime and Justice Ann Report, Div of Criminal Justice Servs.
1990 Crime and Justice Ann Report, Div of Criminal Justice Servs.
1991 Crime and Justice Ann Report, Div of Criminal Justice Servs.
Alschuler, The Failure of Sentencing Guidelines: A Plea for Less Aggregation, 58 U Ch L Rev 901 (1991).
Karle and Sager, Are the Federal Sentencing Guidelines Meeting Congressional Goals?: An Empirical and Case Law Analysis, 40 Emory LJ 393 (1991).
Lowenthal, Mandatory Sentencing Laws: Undermining the Effectiveness of Determinate Sentencing Reform, 81 Cal L Rev 61 (1993).
Mulligan, Cruel and Unusual Punishments: The Proportionality Rule, 47 Fordham L Rev 639 (1979).
Rosenblatt, New York's New Drug Laws and Sentencing Statutes (1973).
Signorelli, A Judicial Analysis and Critique of the New Drug and Sentencing Laws, 46 NY St BJ 9 (Jan. 1974).
US Dept of Justice, Bureau of Justice Statistics, Sentencing in the Federal Courts: Does Race Matter?, The Transition to Sentencing Guidelines, 1986-1990, at 1 (Summary) (1993).